# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CA-00015-SCT

*TALLAHATCHIE VALLEY ELECTRIC POWER ASSOCIATION AND SERVICEPLUS ENERGY CORPORATION*

*v.*

*MISSISSIPPI PROPANE GAS ASSOCIATION, INC.*


| | |
|---|---|
| DATE OF JUDGMENT: | 7/2/1999 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | COLMON S. MITCHELL |
| | LARRY D. MOFFETT |
| | C. MICHAEL ELLINGBURG |
| ATTORNEYS FOR APPELLEE: | JOHN EDWARD MILNER |
| | STEPHEN J. CARMODY |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND RENDERED-01/10/2002 |
| MOTION FOR REHEARING FILED: | 1/28/2002; denied 4/11/2002 |
| MANDATE ISSUED: | 4/18/2002 |

**EN BANC.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. This appeal arises from a Judgment and Permanent Injunction issued by the Chancery Court of Hinds County against Tallahatchie Valley Electric Power Association ("TVEPA"). We are asked to determine whether the statutory scheme by which rural electric power associations, such as TVEPA, are authorized, allows those associations to acquire a controlling or total interest in business enterprises which are not associated with the delivery of electric power. We find that the chancery court correctly determined that TVEPA exceeded its statutory authority in acquiring a controlling interest in such an enterprise. However, because plaintiff MPGA has no legal right to be free of the lawful competition posed by DeSoto Gas, it has asserted no legally cognizable injury upon which the injunction may be granted. Accordingly, the judgment and permanent injunction of the chancery court must be reversed and rendered.

## FACTS

¶2. In August,1998, the Mississippi Propane Gas Association, Inc. ("MPGA"), a non-profit association representing companies engaged in the sale and distribution of propane gas, filed a Verified Compliant for

Injunctive Relief and Declaratory Judgment against TVEPA and Serviceplus Energy Corporation ("ServicePlus").[1] TVEPA is a not-for profit association incorporated under Mississippi Electric Power Association Law, Miss. Code Ann. §§ 77-5-201, et seq. (2000) The defendant ServicePlus is a wholly-owned Subsidiary of TVEPA. ServicePlus owns all of the stock of DeSoto Gas Company ("DeSoto"), a Mississippi business corporation engaged in the distribution and sale of propane gas.

¶3. In July, 1999, after the filing of numerous pleadings, motions, and a trial, the lower court entered a Judgment and Permanent Injunction. In its Judgment, the court adopted and incorporated its May 12, 1999, Opinion and Order finding that TVEPA and ServicePlus "exceeded the scope of their statutory authority to conduct business and are hereby permanently enjoined from owning or operating DeSoto Gas Company or any other company with an interest in the business of propane gas distribution or supply."

¶4. In July, 1999, TVEPA filed a Motion for a New Trial, to Alter or Amend Judgment, or Alternatively, for Stay of Judgment During Pendency of Appeal. In December, 1999, the trial court denied TVEPA's post-trial motions. On January 3, 2000, TVEPA and ServicePlus perfected their appeal to this Court.

¶5. During the 1930's, the United States Congress passed laws allowing the formation of rural electric associations with the intent of provide rural citizens with affordable electric energy. 7 U.S.C.A. §§ 901 *et seq.* ("federal rural electrification laws"). In 1936, the State of Mississippi passed the "Electric Power Association Act," Miss. Code Ann. §§ 77-5-201 et seq. (2000) ("Miss. Elec. Act") so that rural citizens would be eligible to receive the benefits of the federal law and for the purpose of:

> promoting and encouraging the fullest possible use of electric energy by making electric energy available at the lowest cost consistent with sound economy and prudent management of the business of such corporation.

Miss. Code Ann. § 77-5-205.

¶6. In 1937, TVEPA was formed pursuant to the Miss. Elec. Act. The purpose of TVEPA, as described by its charter, is consistent with the language of Miss. Code Ann. § 77-5-205. TVEPA is owned and controlled by its members. TVEPA's Board of Directors manages all of TVEPA'S affairs and is comprised of people who are already members of TVEPA.

¶7. TVEPA provides electricity to areas located in the counties of Panola, Tate, Tallahatchi, and Yalobusha, with additional service areas located in portions of the counties of Grenada, Quitman, Tunica, Lafayette, and Calhoun. The Mississippi Public Service Commission delineates the areas TVEPA may serve with certificates of public convenience and necessity.

¶8. In 1997, TVEPA's board determined that TVEPA should invest in a propane business in an effort to keep its rates down and encourage economic development. The board directed its general manager to negotiate with the owners of DeSoto Gas, a propane distributor located in Hernando, Mississippi. TVEPA's Board of Directors approved an option to purchase all of the stock or assets of DeSoto Gas from the Emerson family. The Board also decided to form a subsidiary to engage in for-profit activities including the purchase of DeSoto Gas. TVEPA authorized a multi-million dollar loan to the subsidiary for the purpose of acquiring all of the stock or assets of DeSoto Gas.

¶9. On February 26, 1998, TVEPA and/or its subsidiary entered into an option agreement to purchase 100% of the DeSoto Gas stock. The terms of the option included payment of $100,000 for the option,

$2.25 million in cash at closing, and $1,672,296.42 in a five year promissory note. On May 1, 1998, the TVEPA board met again and formed a wholly-owned subsidiary named ServicePlus Energy Corporation.

¶10. ServicePlus entered into a Purchase Agreement with the owners of DeSoto, in which TVEPA guaranteed the promissory note for ServicePlus. On May 26, 1998, TVEPA borrowed money from the National Rural Utilities Finance Corporation. TVEPA loaned ServicePlus the money to purchase the stock and guaranteed the promissory note for the remaining balance due on the purchase of the stock from the DeSoto Gas stockholders. On May 29 and June 1, 1998, the agreement to purchase, the promissory note, the guaranty and other purchase documents were approved and executed by TVEPA. After the purchase, many of the officers and members of the board of directors of ServicePlus and DeSoto overlapped as officers and board members of TVEPA.[(2)]

¶11. Aggrieved by the judgment of the chancery court, TVEPA raises the following issues on appeal:

**I. WHETHER TVEPA EXCEEDED ITS STATUTORY AUTHORITY BY ACQUIRING AN INTEREST IN DESOTO GAS COMPANY.**

**II. WHETHER THE FEDERAL RURAL ELECTRIFICATION ACT PREEMPTS MISSISSIPPI'S ELECTRIC POWER ASSOCIATION ACT.**

**III. WHETHER THE MPGA HAS STANDING TO CHALLENGE TVEPA'S OWNERSHIP IN DESOTO GAS COMPANY.**

**IV. WHETHER THE JUDGMENT OF THE LOWER COURT IS VOID BECAUSE OF THE FAILURE TO JOIN THE UNITED STATES AS AN INDISPENSABLE PARTY PURSUANT TO RULE 19.**

**V. WHETHER THE JUDGMENT OF THE LOWER COURT IS CLEARLY ERRONEOUS AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE.**

## STANDARD OF REVIEW

¶12. This Court has long held that findings of fact made by a chancellor will not be disturbed unless they are either manifestly wrong or clearly erroneous. *See **Smith v. Dorsey***, 599 So. 2d 529, 533 (Miss. 1992). This Court has also determined that "[w]hen the [chancellor's] determination is one of law rather than fact, 'the familiar manifest error/substantial evidence rule does not prevent this Court from conducting a de novo review of the chancellor's finding.'" *Tisdale v. Clay*, 728 So. 2d 1084, 1085 (Miss. 1999) (quoting ***Stevenson v. Stevenson***, 579 So. 2d 550, 552-53 (Miss. 1991)).

## DISCUSSION

**I. WHETHER TVEPA EXCEEDED ITS STATUTORY AUTHORITY BY ACQUIRING AN INTEREST IN DESOTO GAS COMPANY.**

¶13. In 1936, Congress created the Rural Electrification Act of 1936 ("REAct"), codified at 7 U.S.C. § 901 et seq., which empowered the REA, a federal agency, to provide rural America with low cost electricity and telephone service by lending funds and technical assistance to rural electric and telephone systems. In 1936, the Mississippi Legislature passed the Electric Power Association Act in order to enable

the its rural citizens to benefit from the federal law. 1936 Miss. Laws ch. 184.

¶14. In 1970, after an attempt to terminate the REA loan program by President Nixon, Congress created a federal policy that "rural electric and telephone systems should be encouraged and assisted to develop their credit needs from their own financial organizations and other sources ..." 7 U.S.C. § 930. At the same time, however, other REA regulations prohibited REA borrowers from investing more than 3 percent of their funds in "non-Act" purposes, which entailed purposes other than providing electricity. In 1987, responding to this limitation Congress amended the REAct adding 7 U.S.C. § 940b which allowed borrowers under the REA loan program to "invest its own funds or make loans or guarantees not in excess of 15 percent of its total utility plant for 'non-Act' purposes."

¶15. TVEPA contends that the Miss. Elec. Act and the Federal REAct must be read *in pari materia* because both laws present a collaborative effort attempting to address the issue of low-cost electricity to rural areas. In support of this argument, TVEPA cites a litany of cases from different jurisdictions holding that the state laws should be interpreted *in pari materia* with the federal law. *See, e.g.*, **Morton v. Hammond**, 604 P.2d 1, 4 (Alaska 1979) (where state and federal statutes deal with same subject matter and state schemes relies on federal scheme, statutes are *in pari materia*); **Arizona Civil Rights Div. v. Olson**, 643 P.2d 723, 728 (Ariz. 1982) (Arizona Civil Rights Act interpreted in pari materia with Title VII and federal Equal Pay Act of 1963); **Industrial Comm'n of State of Colorado v. Board of County Comm'rs**, 690 P.2d 839, 842 (Colo. 1984) (Colorado unemployment tax laws interpreted in pari materia with Federal Unemployment Tax Act). The fact that these laws were enacted at the same time, under the same circumstances, and for the same purpose, TVEPA claims, reinforces the argument that these laws should be construed together.

¶16. MPGA agrees that "in construing statutes, all statutes *in pari materia* are taken into consideration, and a legislative intent deduced from a consideration as a whole." **Roberts v. Mississippi Republican Party State Executive Comm.**, 465 So. 2d 1050, 1052 (Miss. 1985). MPGA asserts, however, that the in pari materia doctrine is invoked only when the language of the statute is ambiguous. **Hubbard v. McKey**, 193 So. 2d 129, 131 (Miss.1966). Here, MPGA contends, the statute is not ambiguous; thus, there is no reason to invoke the doctrine.

¶17. Moreover, MPGA urges that the code sections of the Miss. Elec. Act, when read separately or together do not allow for TVEPA to own and operate a propane gas business through its wholly-owned subsidiary. If the in pari materia doctrine is invoked, MPGA stresses, it only follows that each section of the Code dealing with the same or similar subject matter must be read together, not *in pari materia* with the federal REAct. **Mississippi Pub. Serv. Comm'n v. Municipal Energy Agency of Mississippi**, 463 So.2d 1056, 1058 (Miss. 1985).

¶18. TVEPA maintains that its investment in ServicePlus and ServicePlus' investment in DeSoto are actions authorized and contemplated by 7 U.S.C. § 940b. The fact that Congress amended REAct with 7 U.S.C. §930, TVEPA argues, declaring that "rural electric and telephone systems should be encouraged and assisted to develop their resources and ability to achieve the financial strength needed to enable them to satisfy their credit needs from their own financial organizations and other sources . . ." supports the action undertaken by TVEPA. TVEPA states that since its investment in ServicePlus and/or DeSoto is less than 15 percent of its total utility plant, their action is authorized by federal law and, therefore, within the scope of TVEPA's authority.

¶19. TVEPA argues that by examining the corporate purpose of TVEPA under the Miss. Elec. Act and against the backdrop of the language, purposes and policies of both state and federal law it is clear that TVEPA is authorized and empowered to form and own the stock in ServicePlus. TVEPA argues that because Miss. Code Ann. § 77-5-205 *requires* TVEPA to provide electricity at the lowest cost possible means, it must make prudent business decisions for the benefit of the company. TVEPA further contends that the ability to make these business decisions is sanctioned by Miss. Code Ann. §§ 77-5-229 and 77-5-231, which when read in conjunction with each other and § 77-5-251, mandate that TVEPA has broad power to make business decisions. Thus, the express language embodied in the Miss. Elec. Act, TVEPA submits, allows the formation and ownership of ServicePlus in order to "lower the cost of electricity to TVEPA's members, improve TVEPA's financial strength, and thereby help TVEPA make electric energy available to its member owners at the lowest cost possible."

¶20. This Court refuses to adopt such a strained interpretation of the relevant statutes when our statutory scheme expressly and unambiguously provides otherwise. While TVEPA is correct in noting that REAct and the Miss. Elec. Act were created for similar purposes, the Miss. Elec. Act specifically governs the formation and operation of rural electric power associations in Mississippi. The United States Supreme Court has held that REAct is enabling legislation which affords substantial deference to state statutory and regulatory authority. *See Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 103 S.Ct. 1905, 76 L. Ed. 2d 1 (1983).[(3)]

¶21. The Miss. Elec. Act. provides that the article is to be liberally construed, and declares that the article is complete in itself and shall be controlling. Miss. Code Ann. §77-5-251. The Act contains a clear expression of legislative intent that member corporations be prohibited from acquiring an interest in business enterprises not associated with the delivery of electric power. Even a liberal interpretation of the applicable statutes results in the conclusion that TVEPA is limited to the acquisition of electric energy assets.

¶22. As its name implies, the Mississippi Electric Power Association Law was enacted to encourage "the fullest possible use of **electric** energy." Miss. Code Ann. § 77-5-205 (emphasis added). Both Miss. Code Ann. § 77-5-229, which articulates the general powers granted to electric associations, and Miss. Code Ann. § 77-5-23, which articulates the specific powers, provide that the powers granted therein are limited to acts necessary for the accomplishment of the corporate purpose. Section 77-5-229, which articulates the general powers granted states:

> Each corporation formed under this article is hereby vested with all power **necessary or requisite for the accomplishment of its corporate purpose**, and no enumeration of particular powers hereby granted in this article shall be construed to impair any general grant of power herein contained, or to limit any such grant to a power or powers of the same class or classes as those enumerated.

(emphasis added). Section 77-5-231, which contains the grant of specific power provides, in pertinent part:

> A corporation created under the provisions of this article shall have power to do any and all acts or things **necessary or convenient for carrying out the purposes for which it was formed**, including, but not limited to:
>
> * * *
>
> (c) To acquire, hold and dispose of property, real and personal, tangible and intangible, or interests

therein and to pay therefor in cash or property or on credit, and to secure and procure payment of all or any part of the purchase price thereof on such terms and conditions as the board shall determine.

(emphasis added).

¶23. TVEPA's corporate charter, consistent with the language of § 77-5-205, states that it was formed to "encourage the fullest possible use of **electric** energy in the State of Mississippi" and, consistent with the language of § 77-5-231, to perform actions necessary and convenient to accomplishing its purpose. TVEPA's corporate purpose is limited to and cannot exceed the powers granted by the statutory scheme pursuant to which it was created. Section § 77-5-205 provides in relevant part:

> Three or more natural persons may ... form a corporation not organized for pecuniary profit for the purpose of promoting and encouraging the fullest possible use of **electric** energy by making **electric** energy available at the lowest cost consistent with sound economy and prudent management of the business of such corporations.

(emphasis added). Miss. Code Ann. § 77-5-225 provides that "... the corporate purpose of each corporation formed under this article shall be to render **service** to its members only." (emphasis added). TVEPA is permitted to render service and to acquire, own, operate, maintain, and improve a **system or systems**. Miss. Code Ann. § 77-5-231(d) (emphasis added). "Service" is defined as "the sale or other disposition of **energy**... at the lowest cost consistent with sound economy, public advantage and the prudent conduct of the business of a corporation." Miss. Code Ann. § 77-5-203(1)(emphasis added). "System" is defined as 'plant, works, system, facilities or properties... useful in connection with the generation, production, transmission or distribution of **energy**. § 77-5-203(f) (emphasis added). "Energy" is defined as all **electric** energy no matter how or where generated or produced." § 77-5-203(d) (emphasis added).

¶24. The language of the above statutes is clear that TVEPA is empowered to provide electricity. Nothing in the statutory scheme authorizes TVEPA to distribute another form of energy. Though TVEPA is granted powers necessary and convenient for carrying out the purposes of its organization and is authorized to acquire property to carry out those purposes, it can hardly be argued that it is "necessary or convenient" for TVEPA to sell propane gas to accomplish its purposes. Though the language "necessary or convenient" arguably broadens the powers granted to TVEPA, it does not enable TVEPA to engage in businesses which exceed its statutory or corporate purpose solely for the aim of increasing its bottom line under the guise of "prudent business decisions." As the trial court stated in its opinion, under TVEPA's interpretation of these statutes, it may own, operate, or invest up to 15% of its total utility plant in a department store, restaurant, or any other non-electric business, as long as the investment provides economic development for rural communities and profits which can be used to lower electric rates. The authority for such an interpretation simply cannot be found in either the letter or the purpose of the statutory scheme.

¶25. The Georgia Supreme Court decided a case nearly identical to that at hand in *Flint Elec. Membership Corp. v. Barrow*, 523 S.E.2d 10 (Ga. 1999). The issue before the Georgia Court was whether Flint Electric Membership Corporation ("Flint") should be allowed to sell propane gas to its customers. Flint was a rural electric association that set up a wholly owned subsidiary, Flint Electric, to own and operate a propane gas business and sell propane to its electric customers. *Id*. Flint's statutory purpose was "to engage in rural electrification." *Id.* at 11. In 1997, Flint amended its charter to allow it "to engage in any lawful act, business, or activity which in the discretion of the Board of the Directors would be beneficial

to the members." *Id.* Flint then formed a subsidiary corporation with the intention of selling propane gas to its members. *Id*.

¶26. Georgia law provides that an electric membership corporation may serve any one or more of the following purposes:

> (1) To furnish electrical energy and service; (2) To assist its members in the efficient and economical use of energy; (3) To engage in research and to promote and develop energy conservation and sources and methods of conserving, producing, converting, and delivering energy; and (4) To engage in any lawful act or activity necessary or convenient to effect the foregoing purposes.

O.C.G.A. § 46-3-200 (2000). Further, O.C.G.A. § 46-3-201(b)(5) (2000) provides that a rural electric association may "purchase; take; receive by gift, will, or otherwise; lease; or otherwise acquire, own, hold, improve, use, and otherwise deal in and with real or personal property or any interest therein, wherever situated." The Georgia Supreme Court held that the rural electric association could not operate a propane gas company through a subsidiary, stating:

> Even if it can be said that subsections (2), (3) and (4) of O.C.G.A. § 46-3-200 authorize an EMC [electric association] to assist its members in the use of another energy source, promote its development, or engage in lawful activities to effect such a purpose, nothing in the GEMCA [Georgia's rural electric association act] authorizes an EMC to furnish or sell another form of energy. In fact, O.C.G.A. § 46-3-201 makes it clear that, **while an EMC is empowered to "assist its members . . . in the efficient and economical use of energy," O.C.G.A. § 46-3-201 (b) (8), it can only furnish or sell "electricity."** O.C.G.A. § 46-3-201 (b) (7). And while O.C.G.A. § 46-3-201 (b) (26) gives an EMC "all powers necessary or convenient to effect any or all of the purposes for which the electric membership corporation is organized," **it can hardly be said that it is "necessary or convenient" for Flint to sell propane gas to accomplish its purposes.**

523 S.E 2d at 637-78 (emphasis added). TVEPA argues that this Court's interpretation of the Miss. Elec. Act should be broader than that espoused by the Georgia Supreme Court in interpreting the Georgia Act. TVEPA apparently relies on the fact that the Georgia statute lacks the liberal construction language. *See* Miss. Code Ann. § 77-5-231. Even a liberal interpretation of our statutes requires the conclusion that TVEPA is limited to the acquisition of electric energy assets. This Court cannot, in the name of liberal interpretation, expand the clear and express language of these statutes to affect an alteration more appropriately sought through legislative means. The lower court did not err in its interpretation of these statutes.

### II. WHETHER THE FEDERAL RURAL ELECTRIFICATION ACT PREEMPTS MISSISSIPPI'S ELECTRIC POWER ASSOCIATION ACT.

¶27. TVEPA argues that Congress' promulgation of 7 U.S.C. § 930 and the legislative history of REAct indicate that TVEPA is authorized by federal law to invest in ServicePlus. TVEPA alleges that the Miss. Elec. Act serves to frustrate the purposes of the federal act, and that this Court should find that, to the extent its provisions conflict with the REAct, the Miss. Elec. Act is preempted.

¶28. The United States Supreme Court has held that REAct is enabling legislation which affords substantial deference to state statutory and regulatory authority. *See **Arkansas Elec. Coop. Corp. v. Arkansas Pub.***

*Serv. Comm'n*, 461 U.S. 375, 103 S.Ct. 1905, 76 L. Ed. 2d 1 (1983). "Nothing in the [federal] Rural Electrification Act expressly preempts state rate regulation of power cooperatives financed by the REA." *Id*. at 385-86. In explaining that the REAct established a lending agency and not a regulatory body, the Supreme Court stated:

> the legislative history . . . makes abundantly clear . . . that, although the REA was expected to play a role in assisting the fledgling rural power cooperatives in setting their rate structures, it would do so within the constraints of existing state regulatory schemes.

*Id.* at 386 (citing 80 Cong. Rec. 5316 (Rep. Lea); Hearing on S. 3483 before the House Committee on Interstate and Foreign Commerce, 74th Cong., 2d Sess., 30, 37, 51, 52 (1936)).

¶29. Neither does the REAct implicitly preempt the Miss. Elec. Act. The Fifth and Tenth Circuit Courts of Appeal have held that state regulatory acts are not preempted by conflicting federal regulations promulgated by the Secretary of Agriculture under the federal REAct. *See In re Cajun Elec. Power Co-op, Inc.*, 109 F.3d 248 (5th Cir. 1997) (holding that REAct nor its regulations expressly or impliedly preempt Louisiana regulations governing operation of electric cooperatives); *City of Stilwell v. Ozarks Rural Elec. Co-op Corp.*, 79 F.3d 1038 (10th Cir. 1996) (stating that "the RE Act ... does not purport to regulate the operation of rural electric cooperatives; it merely assists their operation by offering low interest financing. The [Oklahoma law regulating electric cooperatives] establishes the framework under which the RE act-spawned rural cooperatives can operate.... To argue that [the state law's limits on powers conferred to rural cooperatives] somehow frustrates the purpose of the RE Act is to contend that state regulations should empower rural cooperatives witnout limitations. Such a position is untenable.").

¶30. Furthermore, the language of 7 U.S.C. § 904, which authorizes the Secretary of Agriculture to provide loans under the REAct provides, in part:

> The Secretary is authorized and empowered ... to make loans for rural electrification to persons, corporations, States, Territories, and subdivisions and agencies thereof ... **organized under the laws of any State or Territory of the United States**, for the purpose of financing the construction and operation of generating plants, electric transmission and distribution lines or systems for the furnishing and improving of electric service to persons in rural areas.... Such loans shall be on such terms and conditions ... as the Secretary shall determine ... except that no loan ... shall be made unless **the consent of the State authority having jurisdiction in the premises is first obtained**.

(emphasis added). This language acknowledges that the creation and organization of rural electric associations is left to the states and that the state must give its consent in order for loans to be received. Section 940b is permissive in nature, allowing a recipient of federal funds to invest 15% of its revenue in non-Act purposes. The Miss. Elec. Act does not authorize this action. Absent legislative amendment, the actions of TVEPA exceed its statutory authority.

### III. WHETHER THE MPGA HAS STANDING TO CHALLENGE TVEPA'S OWNERSHIP IN DESOTO GAS COMPANY.

¶31. TVEPA argues that the action at hand is essentially an ultra vires challenge, and that, MPGA, therefore, lacks standing to bring the action. *See West Bros., Inc. v. Illinois Central R.R.*, 222 Miss. 335, 75 So. 2d 723, 726 (1954) (business competitors have no standing to challenge activities of corporate

rivals as being ultra vires); ***Home Owners' Loan Corp. v. Moore***, 184 Miss 283, 185 So. 253, 255 (1939) (ultra vires act can be challenged only by the sovereign which created the corporation).

¶32. MPGA argues that it has not brought an *ultra vires* challenge, but, rather, that it has challenged TVEPA's actions as illegal. It argues that TVEPA's ownership in Desoto Gas violate Miss. Code Ann. § 77-5-231 and § 77-5-203, which expressly limit electric association activities to the "distribution ... of electric energy." Additionally, MPGA argues that one of its members, Dowdle Butane Gas Co., is also a member-owner of TVEPA. MPGA asserts that it has standing to sue because Dowdle Butane has standing to challenge any *ultra vires* acts of TVEPA.

¶33. We begin by noting that Mississippi's standing requirements are quite liberal. ***Fordice v. Bryan***, 651 So. 2d 998, 1003 (Miss. 1995); ***Van Slyke v. Bd. of Trustees of State Institutions of Higher Learning***, 613 So. 2d 872, 875-76 (Miss. 1993). A party may bring a lawsuit if they assert a colorable interest in the subject matter of the litigation or experience an adverse effect from the conduct of the defendant. ***Dye v. State ex rel. Hale***, 507 So. 2d 332, 338 (Miss. 1987); ***Frazier v. State***, 504 So. 2d 675, 691-92 (Miss. 1987). In ***Belhaven Improvement Ass'n, Inc. v. City of Jackson***, 507 So. 2d 41 (Miss. 1987), this Court recognized that an association has standing to bring suit on behalf of its members when:

> a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested, requires the participation of individual members in the lawsuit.

*Id.* at 46. The action may be brought either in the name of the association or in the name of one or more individual members. *See **White Cypress Lake Dev. Corp. v. Hertz***, 541 So. 2d 1031, 1034 (Miss. 1989) (citing ***Belhaven Improvement***, 507 So. 2d at 45-47).

¶34. MPGA's claim is, in essence, a challenge to TVEPA's power to act pursuant to statutory authority and its corporate charter, and, therefore, an *ultra vires* challenge, as distinguished from an act "*malum prohibitum*" which is, in and of itself, illegal. *See **Pendleton v. Williams***, 198 So. 2d 235, 239 (Miss. 1967). Nevertheless, MPGA has standing in its representation of Dowdle Butane. Dowdle Butane is a member of MPGA and TVEPA, purchases electricity from TVEPA, and, as such, is one of the member owners of TVEPA. Miss. Code Ann. § 79-4-3.04(b) (1996) states that a corporations power to act may be challenged in an action by a shareholder to enjoin the act. Dowdle Butane, arguably, has standing to sue in its own right. MPGA asserts interests relevant to its purpose as Dowdle Butane has been adversely affected by TVEPA's venture into the propane gas business. And, finally, the action may have been brought either in the name of MPGA or in the name of Dowdle Butane. *See **White Cypress***, 541 So. 2d at 1034; ***Belhaven Improvement***, 507 So. 2d at 46-47.

### IV. WHETHER THE JUDGMENT OF THE LOWER COURT IS VOID BECAUSE OF THE FAILURE TO JOIN THE UNITED STATES AS AN INDISPENSABLE PARTY PURSUANT TO RULE 19.

¶35. TVEPA argues that the United States was a necessary party to this action, and that the failure to join the United States pursuant to Miss. R. Civ. P. 19 renders the Court's action void. Rule 19 provides, in pertinent part:

(a) A person who is subject to the jurisdiction of the court shall be joined as a party in the action if:

(1) in his absence complete relief cannot be accorded among those already parties, or

(2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest....

TVEPA's loans from the Rural Electrification Administration contain after-acquired property clauses which serve to encumber all of TVEPA's property as security for those loans. Accordingly, TVEPA's stock in ServicePlus and, indirectly, Desoto Gas are encumbered. However, it should also be noted that federal funds were not used to purchase Desoto Gas.

¶36. MPGA contends that TVEPA has waived its joinder argument by failing to timely raise the issue below. This argument is without merit. TVEPA raised the joinder issue as early as its answer and also at trial. This Court has recognized that the federal courts have, as a matter of equity, allowed defendants to raise the issue of non-joinder for the first time on appeal where the interests of absent persons are at stake. *Shaw v. Shaw*, 603 So. 2d 287, 293 (Miss. 1992).

¶37. TVEPA argues that the United States should have been made a party pursuant to Rule 19(a)(2). It should be noted that Rule 19(a)(2) requires more than that the allegedly necessary party claim an interest relating to the subject of the action claims. TVEPA argues that the court's injunction forced TVEPA to divest itself of its interest in Desoto Gas, thus impairing the security interest of the United States. TVEPA also asserts that divestiture could subject TVEPA to double litigation and inconsistent obligations. TVEPA relies on *Franz v. East Columbia Basin Irrigation Dist.*, 383 F.2d 391 (9th Cir. 1967) and *City of Anadarko v. Caddo Elec. Corp.*, 258 F. Supp. 441 (W.D. Okla. 1996). In *Franz*, the plaintiff owned land in the irrigation district and was attempting to withdraw land from the district. The court found that the United States was a necessary party because the United States had invested money in the project, and the financial solvency of the project was threatened by the plaintiff's withdrawal. *Franz*, 383 F.2d at 392. In *City of Anadarko*, the city attempted to purchase property, mortgaged to the United States, from the electric corporation through condemnation proceedings. *City of Anadarko*, 258 F. Supp. at 443. The court held that the United States was an indispensable party by virtue of its mortgage on the property, which would be adversely affected by a judgment of condemnation. *Id.*

¶38. These cases are distinguishable from the instant case. The Court's determination in *Franz* that the United States was an indispensable party was based upon the finding that if the plaintiff were allowed to withdraw his lands from the irrigation district, the financial solvency of the project will be threatened and the chances of repayment to the United States of money invested in the project will be damaged. *Franz*, 383 F.2d at 392. In the case sub judice, the chancery court took notice of the fact that the loans between TVEPA and the REA are fully collateralized by the assets of TVEPA without regard to Desoto Gas. The federal law relied on by TVEPA, 7 U.S.C. § 904 states that "loans under this section shall not be made unless the Secretary finds and certifies that in his judgment the security therefor is reasonably adequate and such loans will be repaid within the agreed time." The last loan from the REA to TVEPA was made in 1990, eight years prior to TVEPA's acquisition of DeSoto Gas. TVEPA offers no evidence that its ability to pay the United States will be detrimentally affected by the sale of its interest in DeSoto Gas.

¶39. In *City of Anadarko*, the property at issue was purchased with funds loaned from the REA. 258 F. Supp. at 443. The consent of the Administrator of the REA to the sale had not been obtained as required by 7 U.S.C. § 904. No such consent is required in the case at hand. Section 904 authorizes the REA to make loans "for the purpose of financing the construction and operation of generating plants, electric transmission and distribution lines or systems for the furnishing and improving of electric service to persons in rural areas." Section 940b, on which TVEPA relies as authority for the investment in Desoto Gas, provides that TVEPA may invest, without approval of the Secretary, its own funds. Section 907 states:

> No borrower of funds under sections 904 or 922 of this title shall, without the approval of the Secretary, sell or dispose of its property, rights, or franchises, acquired under the provisions of this chapter, until any loan obtained from the Rural Electrification Administration, including all interest and charges, shall have been repaid.

Again, the funds used to purchase Desoto Gas were not federal funds loaned by the REA pursuant to § 904. TVEPA is not required to notify the Secretary prior to disposition of the property. Furthermore, the relief granted by the chancery court charged TVEPA with the sale of the stock. The court did not order mandatory divestiture. Any interest of the United States in the stock by virtue of the after-acquired property clause remains intact, subject to TVEPA's disposition of the stock, which will, presumably, be carried out in accordance with any requirements of the REA.

## V. WHETHER THE JUDGMENT OF THE LOWER COURT IS CLEARLY ERRONEOUS AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE.

¶40. TVEPA argues that the record wholly fails to support any finding of legal injury by MPGA's members upon which to base the award of a permanent injunction. The trial court found that "[t]he evidence shows that since the purchase of DeSoto Gas by TVEPA, through its subsidiary ServicePlus, members of MPGA have lost customers to DeSoto Gas in service areas of TVEPA that were not formerly served by DeSoto Gas." TVEPA contends that the loss of customers to Desoto Gas is not a legally cognizable harm and cannot serve as the basis for awarding injunctive relief against TVEPA.

¶41. The question of whether MPGA's members suffered legally cognizable injury is closely tied to the question of standing, addressed previously. It is important that we here again observe that the basis of MPGA's standing in this action is by way of its member, Dowdle Butane, which is also an owner of TVEPA. Detrimental to MPGA's claim of injury, however, is the fact that the injury allegedly suffered by Dowdle Butane (and all its members, for that matter) does not arise from Dowdle Butane's status of member-owner of TVEPA, but from its status of competitor to DeSoto Gas. The question of whether MPGA has suffered a legally cognizable injury is a question separate from the question of standing, as explained by the Supreme Court in *[Davis v. Passman](#)*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979):

> The Court of Appeals appeared to confuse the question of whether petitioner had standing with the question of whether she asserted a proper cause of action.... The nature of petitioner's injury ... is relevant to the determination of whether she has "alleged such a personal stake in the outcome of the controversy ..." And under the criteria we have set out, petitioner clearly has standing to bring this suit.... Whether petitioner has asserted a cause of action, however, depends not on the quality or extent of her injury, but on whether the class of litigants of which petitioner is a member may use the courts to enforce the right at issue.

*Id.* at 239-40 n.18, 99 S.Ct. at 2274 n.18 (citations omitted). Thus, while there exists a factual injury sufficient to give MPGA standing, we must determine whether the injury is of legal significance, so as to entitle MPGA to the relief requested.

¶42. MPGA asserts that the operation of DeSoto Gas has caused its members to lose customers to DeSoto Gas since its purchase by TVEPA. Implicit in MPGA's argument is the assertion that because TVEPA's ownership of DeSoto Gas is unlawful, so is the competition afforded by DeSoto Gas. TVEPA admits that competitive "damage" to member businesses has occurred, but contends that it is not the basis of a cause of action since it is *damnum absque injuria*-a damage not consequent upon the violation of any right recognized by law. We agree. Though their business may have suffered "damage" from the operation of DeSoto Gas, such "damage" is not legally cognizable injury which may serve as the basis for injunctive relief.

¶43. This principle was clearly recognized by the United States Supreme Court in *[Alabama Power Co. v. Ickes](...)*, 302 U.S. 464, 58 S.Ct. 300, 82 L. Ed 374 (1938), in which an electric company brought suit to enjoin the Federal Emergency Administrator of Public Works from making allegedly unauthorized loans to municipal corporations in Alabama. The injury alleged was the electric company's loss of business as a result of the lawful, albeit destructive, use of the loans by the municipalities in establishing competing plants. *Id.* at 475. In finding that the electric company had not asserted a legally cognizable injury, the Supreme Court stated as follows:

> Unless a different conclusion is required from the mere fact that petitioner will sustain financial loss by reason of the lawful competition which will result from the use by the municipalities of the proposed loans and grants, it is clear that petitioner has no such interest and will sustain no legal injury as enables it to maintain the present suits.... "An injury, legally speaking, consists of a wrong done to a person, or, in other words, a violation of his right. It is an ancient maxim, that damage to one, without an injury in this sense (damnum absque injuria), does not lay the foundation of an action; because, if the act complained of does not violate any of his legal rights, it is obvious, that he has no cause to complain... Want of right and want of remedy are justly said to be reciprocal...." *Parker v. Griswold*, 17 Conn. 288, 302, 303, 42 Am.Dec. 739....

> The only pertinent inquiry, then, is What enforceable legal right of petitioner do the alleged wrongful agreements invade or threaten? ... **Nor will the subsequent application by the municipalities of the moneys derived therefrom give rise to an actionable wrong, since such application, being lawful, will invade no legal right of petitioner. The claim that petitioner will be injured, perhaps ruined, by the competition of the municipalities brought about by the use of the moneys, therefore, presents a clear case of damnum absque injuria. Stated in other words, these municipalities have the right under state law to engage in the business in competition with petitioner, since it has been given no exclusive franchise. If business be curtailed or destroyed by the operations of the municipalities, it will be by lawful competition from which no legal wrong results.**

> **What petitioner anticipates, we emphasize, is damage to something it does not possess - namely, a right to be immune from lawful competition.**

302 U.S. at 478-80 (emphasis added). The Supreme Court refused to accept the assertion "that A, who

will suffer damage from the lawful act of B, and who plainly will have no case against B, may nevertheless invoke judicial aid to restrain a third party, acting without authority, from furnishing means which will enable B to do what the law permits him to do." *Id.* at 481. The Court observed that "[i]t is not unlawful for any one to compete with the company, although the latter may not be authorized to engage in the same business." *Id.* at 482. The Court also explained that a company acting beyond the warrant of the law, in violation of its charter, does not injuriously affect the rights of its competitors. *Id.* at 483.

¶44. MPGA's assertion that it has sustained actionable injuries from TVEPA's investment in DeSoto Gas rests implicitly on the assumption that the activities of DeSoto Gas were themselves unlawful. To the contrary, as *Alabama Power* demonstrates, the fact that TVEPA's ownership of DeSoto Gas was unauthorized does not make the sale of gas by DeSoto Gas unlawful. A corporation is a legal entity separate and distinct from its shareholders. *Skinner v. Skinner*, 509 So. 2d 867, 870 (Miss. 1987). There was no proof offered at trial to support the trial court's refusal to treat these entities as separate, save some common management among the entities. *But see Johnson & Higgins of Miss., Inc.*, 321 So. 2d 281, 285 (Miss. 1975) (common management insufficient to justify piercing the corporate veil); *Murdock Acceptance Corp. v. Adcox*, 245 Miss, 151, 138 So. 2d 890, 895 (1962).

¶45. MPGA relies on *Payne v. Jackson City Lines, Inc.*, 220 Miss. 180, 70 So. 2d 520 (1954), and *Campbell Sixty-Six Exp., Inc. v. J.&G. Exp., Inc.*, 244 Miss. 427, 141 So. 2d 720 (Miss. 1962), for its assertion that businesses have successfully been awarded injunctive relief in Mississippi courts against competitors. These cases are clearly distinguishable. Both cases involved franchised carriers which brought suit to enjoin the activities of other carriers operating without franchises. The franchised carriers in both cases possessed property rights arising out of their franchises. *Payne*, 220 Miss. at 191, *Campbell*, 141 So. 2d at 723-24. Furthermore, the competition presented by the non-franchised carriers was clearly recognized the this Court to be illegal, in violation of a statutory prohibition. *Payne*, 220 Miss. at 190-91; *Campbell*, 141 So. 2d at 726. There is nothing in the record to indicate that plaintiffs are the owners of any franchise, lawfully granted, entitling them, and no others, to sell propane gas in the territory involved. There is here no statutory or contractual right to be free from competition, as there was in *Payne* and *Campbell*. The only injury allegedly suffered is the natural opposition to having territory invaded to which they have no exclusive right.

¶46. Additionally, there is no evidence in the record which causally connects the alleged injury of the business concerns of the MPGA members to TVEPA's investment in DeSoto Gas. The trial court based its finding of irreparable injury to the following: "The evidence shows that since the purchase of DeSoto Gas by TVEPA, through its subsidiary ServicePlus, members of MPGA have lost customers to DeSoto Gas in service areas of TVEPA that were not formerly served by DeSoto Gas."

¶47. Skip Graeber estimated that his company lost 20 to 25 customers to DeSoto Gas. He and that he did not know why the customers switched to DeSoto Gas. Graeber stated that his company competes with numerous other gas companies and that turnover of customers between the companies is not unusual.

¶48. John Dowdle testified that his company lost more than 20 customers, out of a customer base of 130,000, to DeSoto Gas. One of the counties within Dowdle's service area is Panola County, which is also within the area serviced with electricity by TVEPA. He stated that DeSoto Gas had never solicited business in Panola County prior to its purchase by TVEPA. However, he was not able to say whether DeSoto Gas had plans to enter Panola County prior to its purchase by TVEPA. Other testimony demonstrated that

DeSoto Gas had, in fact, operated in Panola County prior to its purchase by TVEPA and had at least 2 customers in that county. Within the year after the purchase by TVEPA its customer base in Panola County grew to 60 customers. There is no indication in the record how many of these customers in the increase switched from Graeber's or Dowdle's companies or even how many of them were previously serviced by a gas company. Dowdle also testified that TVEPA's ownership of DeSoto Gas resulted in "unfair" competition in the gas industry because TVEPA could obtain loans at a lower interest rate than the other gas companies. No showing was made, however, that TVEPA had actually obtained such a loan subsequent to its purchase of DeSoto Gas or that DeSoto Gas had benefitted from such a loan. Even assuming lawful competition on the part of DeSoto Gas is actionable harm, the trial court's finding of irreparable injury on these facts, or lack thereof, is clearly erroneous.

## CONCLUSION

¶49. Though TVEPA's ownership of DeSoto Gas is unauthorized by statute, the members of MPGA have no legal right to be free of the lawful competition posed by DeSoto Gas. Because MPGA has asserted no legally cognizable injury upon which the relief sought may be granted, the judgment and permanent injunction entered by the trial court are reversed, and judgment is rendered here for TVEPA and ServicePlus.

¶50. **REVERSED AND RENDERED.**

**PITTMAN, C.J., WALLER, COBB, AND DIAZ, JJ., CONCUR. McRAE, P.J., AND GRAVES, J., DISSENT WITHOUT SEPARATE WRITTEN OPINION. EASLEY AND CARLSON, JJ., NOT PARTICIPATING.**

1. TVEPA will be used to represent both TVEPA and ServicePlus unless otherwise indicated.

2. For example: The directors of TVEPA are: Jack Flautt (President of TVEPA and ServicePlus), Dan Ferguson (Vice-President of TVEPA and ServicePlus), Gene Standridge (Secretary/Treasurer of TVEPA, ServicePlus, and DeSoto) Danny Ingram (Dir. and Vice-President of DeSoto, Harry House (also director of DeSoto), Lamar Crockett (also director of DeSoto), Robert Chapman, Will Hayes, and Pat Brown. Tom Underwood (General Manager of TVEPA,, C.E.O. of ServicePlus, President of DeSoto and on its board). The only directors of DeSoto Gas who are *not* involved with TVEPA and ServicePlus are: Bowdre Emerson, Phil Emerson, Paul Emerson, and Charles Emerson.

3. One jurisdiction has even held that REACT did not confer regulatory powers upon the Rural Electrification Administration and that REA is a lending agency rather than a classic public utility regulatory body. ***City of Stilwell v. Ozarks Rural Elec. Co-op Corp.***, 79 F.3d 1038 (10th Cir. 1996).