# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-CA-01506-SCT

*PHILIP T. CASCIO, JR.*

*v.*

*CASCIO INVESTMENTS, LLC, JACKIE CASCIO
PEARSON AND PHYLLIS CASCIO*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/23/2019 |
| TRIAL JUDGE: | HON. RICHARD A. SMITH |
| TRIAL COURT ATTORNEYS: | WILLIAM C. BRABEC |
| | LINDSEY O. WATSON |
| | O. STEPHEN MONTAGNET, III |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | O. STEPHEN MONTAGNET, III |
| ATTORNEYS FOR APPELLEES: | WILLIAM C. BRABEC |
| | LINDSEY O. WATSON |
| | TIMOTHY J. ANZENBERGER |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND RENDERED IN PART.  ON CROSS-APPEAL: AFFIRMED - 08/26/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KITCHENS, P.J., MAXWELL AND CHAMBERLIN, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.    This case comes before the Court on direct appeal of a judgment from the Circuit Court of Washington County.  There, Cascio Investments, LLC (Investments), sued Philip T. Cascio (Cascio) for breach of contract, alleging violations of a noncompetition agreement (NCA).  The circuit court found in favor of Investments, and Cascio appeals.  Investments

also cross-appeals regarding additional issues involving the award of punitive damages and injunctive relief. Investments further request attorneys' fees for their defense of this appeal.

## FACTS AND PROCEDURAL HISTORY

¶2.     This case arises from decades of family strife. The Cascio family has long owned and operated a variety of businesses. The patriarch of the family, Phil Cascio, Sr., founded Cascio's Storage and Warehouse, Inc. (CSW), during the 1970s, a business that primarily engaged in warehousing and storage of agricultural products in the Mississippi Delta region and beyond. Eventually, Phil Cascio, Sr., expanded his enterprises, including the establishment of Investments, which purchases properties for lease to commercial or manufacturing tenants.

¶3.     Importantly, as Phil Cascio, Sr., advanced in his years, the general management of these businesses fell to his eldest son, Philip T. Cascio, Jr. Indeed, while the other three children, Jackie Pearson, Phyllis Cascio, and Patrick Cascio, pursued other careers, Cascio, Jr., tended to the day-to-day operations of the Cascio family businesses. Not until later did Phil Cascio, Sr., divide his interests among his children. This extremely dissatisfied Cascio, Jr., who believed he should receive full ownership of the family businesses on account of the years of work he had poured into them. This chain of events led to a degeneration of the familial bonds between the Cascio siblings, which has ultimately resulted in the action before us today.[1]

¶4.     In 2014, Cascio's sisters, Jackie and Phyllis, brought a shareholder-derivative suit

---

[1] As Mark Twain once said, "you never really know someone until you share an inheritance with them."

2

against Cascio for alleged improper uses of their family businesses including, but not limited to, allegations that Cascio used their family businesses as his own "personal piggy bank" while "amassing a fortune of more than $35 million, a multi-million dollar home near Scottsdale, Arizona, and a large Montana ranch." After discovering these discrepancies, Jackie and Phyllis sued their brother Cascio. In October of 2015, the parties met for a two-day-long settlement conference to resolve the issues surrounding the family businesses. An accord was reached. As part of the settlement, the parties would each become one-third owners of CSW. Also, Cascio would agree to surrender his rights in Investments, leaving the two sisters, Jackie and Phyllis, as the remaining owners of the company. Further, Cascio would be given sole ownership of Caspear, LLC (Caspear).

¶5.     During their settlement conference, the parties agreed to an NCA. The agreement stated, in part, that

> [Cascio] will execute a non-compete agreement with *CSW* for a period of five years covering Mississippi, Arkansas, Louisiana, Tennessee, and Missouri. Further, [Cascio] will agree to never hire or solicit Terry Hughes or any other employee to leave the employ of *CSW*. The non-compete agreement would prohibit [Cascio] from being involved, directly or indirectly, in any business that stores agricultural products in the covered area.

(Emphasis added.)

¶6.     On December 10, 2015, before Cascio signed the NCA, the chancellor approved "the settlement reached during the Settlement Conference held on October 27 and 28, 2015." In the December 10, 2015 order, the chancellor specifically required that, "[u]pon satisfaction of the terms of settlement and the execution of all required documents, the parties are hereby ordered and directed to present an Agreed Final Judgment to the Court for its consideration

3

and entry."

¶7.　On December 15, 2015, the agreement was finalized, and Cascio signed the NCA. There were significant additions included in this final version of the NCA. Specifically, under the proposed terms from the October 2015 settlement conference, Cascio promised not to compete *with CSW only*. The actual NCA that he signed on December 15, 2015, is much broader. It included not only CSW but also Investments and C-Rental Services, Inc. (C-Rental).

¶8.　The NCA, which Cascio signed, in relevant part, provides that

3.　For a period of (5) years from the date of this Non-Competition Agreement neither the undersigned nor anyone acting in concert with the undersigned, whether directly or indirectly, will have any contact with any existing customer of *CSW*, *Cascio Investments, LLC ("Investments")* and/or *C-Rental* for any purpose without regard to geographic limits or shall by any means encourage any existing customer of *CSW*, *Investments* and/or *C-Rental* to terminate, reduce or otherwise adversely change, or affect that customer's business relationship with *CSW*, *Investments* and/or *C-Rental*.

4.　The undersigned agrees that he will not use or register in any state the business names "Cascio's Storage and Warehouse, Inc.," "C-Rental Services, Inc.," or any derivation thereof. To the extent the undersigned has registered such names or any derivation thereof with the state of Arizona, such registrations shall be cancelled.

5.　The undersigned warrants that between October 28, 2015 and the date of the execution of this Non-Competition Agreement, the undersigned has taken no actions that would have violated the provisions of this Non-Competition Agreement had it been in effect during that period of time.

6.　It is the intent and desire of the undersigned for this Non-Competition Agreement to be construed broadly. Any ambiguities should be construed broadly in a manner to prevent competition with CSW, Investments, and/or C-Rental. The undersigned hereby agrees that the terms of this Non-Competition Agreement are reasonable and the undersigned hereby expressly waives any defense against this Non-Competition Agreement or any term hereof based on

4

unconscionability.

7. This Non-Competition Agreement is a freely-negotiated, arms-length agreement. There shall be no presumptions or construction for or against any party as the drafting party.

8. In the event of a breach of any provisions of this Non-Competition Agreement, in addition to any provable damages, *CSW*, *Investments* and/or *C-Rental* shall be entitled to injunctive relief and reasonable attorney's fees and litigation expenses. Further, in the event of any breach of this agreement, the time period of non-competition shall be extended by the time the undersigned was in breach, even if the time period of non-competition would have otherwise expired according to the terms of this Non-Competition Agreement.

9. In the event any provision of this Non-Competition Agreement is found to be unenforceable, such shall not invalidate the remaining provisions, which provisions shall remain in full force and effect.

10. The Non-Competition Agreement shall be governed and construed by the law of the State of Mississippi. The undersigned hereby submits to the jurisdiction of the state and/or federal courts having venue over Washington County, Mississippi, for all actions relating to this Non-Competition Agreement and agrees that exclusive venue shall be there.

(Emphasis added.) The final paragraph of the NCA indicated that "[Cascio] has read and understands this Non-Competition Agreement and has executed it freely after full consultation with his counsel."

¶9. The chancellor, per his previous order, entered an "Agreed Final Judgment" on January 11, 2016. This Agreed Final Judgment "approved of the terms of the settlement pursuant to that certain Order Approving Settlement entered on December 10, 2015." While this order did not specifically mention the NCA signed by Cascio on December 15, 2015, the chancellor did find that "*the parties have executed all documents required to effectuate the terms of said settlement*." (Emphasis added.)

5

¶10. Roughly two years later, in January 2018, Investments brought the instant case against Cascio for his alleged breaches of the NCA. Investments alleges that Cascio breached the NCA by contacting five of Investments' customers: CSW, U.S. Ag Recycling (U.S. Ag), Beulah Land Global Farms (Beulah Land), Baker Distributing (Baker), and Aramark. As for CSW specifically, Investments alleges that Cascio sent a threatening letter to the president of CSW, Terry Hughes, warning CSW that a storage facility it used, owned by Investments, was in need of a sprinkler system. The letter stated as follows:

October 6, 2017

MR. TERRY HUGHES
PRESIDENT & CHIEF OPERATIONS OFFICER
CASCIO STORAGE & WAREHOUSE, INC.
BOX 4938
GREENVILLE, MS. 38704-4938

DEAR MR. HUGHES

AS A 33 % STOCK HOLDER OF THIS COMPANY, AND A PERSON WHO HAS ALWAYS BEEN CONCERNED WITH LIABILITY OF STORAGE OF AGRICULTURAL CHEMICALS , [sic] IT HAS BEEN BROUGHT TO MY ATTENTION, THAT CASCIO STORAGE & WAREHOUSE, IS USING FACILITIES, THAT ARE NOT SPRIKLERED [sic] OR CONTAINED. THE FOLLOWING ARE LISTED.
. . . .

CASCIO INVESTMENTS [sic] BUILDING NEEDS TO BE SPRINKLERED [sic] WITH A 3.5 OVER 5,000, [sic] JUST A BUILDING NUMBER 3 [sic] IS, [sic] A SYSTEM THAT CAN COVER AN AGRICULTURAL FIRE, FOR NON HAZARDOUS MATERIAL, AND CHEMICALS. YOU NEED TO APPROACH THEM, AND LET THEM KNOW, THAT CHEMICALS ARE BEING STORED IN THEIR BUILDING, [sic] EITHER THEY SPRINKLER [sic] THE BUILDING, OR GIVE UP THEIR LEASE WITH CASCIO STORAGE. THE FIRE DEPT. NEEDS TO KNOW THIS PRESENTLY TO [sic], SO THEY WILL KNOW THE DANGERS OF ENTERING A BUILDING, WITH CHEMICALS, [sic] WITHOUT A

6

SPRINKLER SYSTEM. I KNOW IN FACT, THAT IS ONE HECK OF A CONTAINMENT IN THAT BUILDING, FOR I DID THAT BUILDING PERSONALLY.

. . . .

IF THEY DON'T HAVE THE MONEY TO COMPLY, [sic] THEN I DO, AND I DON'T NEED ANY OF THEM TO MAKE ADJUSTMENTS TO BUILDINGS AND UPGRADES, IT IS TIME FOR THEM TO WAKE UP!

I WANT AN ANSWER TO THIS LETTER BY NEXT THURSDAY ALSO. [sic] EITHER WE GET OUT OF THOSE WAREHOUSES, ARE [sic] THOSE WAREHOUSES, [sic] ARE BROUGHT UP TO SNUFF, IN COMPLIANCE TO [sic] NFPA 30 CODES [sic]. I DON'T WANT TO HURT CASCIO WAREHOUSE, A BUSINESS THAT I WORKED HARD TO BUILD AND YOU ALSO, BUT I WILL GO TO THE STATE FIRE MARSHALL, IN JACKSON, WITH BUTLER SNOW ATTORNEYS, AND TO THESE CHEMICAL COMPANIES, DIRECT [sic] AND LET THEM KNOW WHAT IS GOING ON, AND MY PLANS TO BUILD, AND BE BACK IN THE WAREHOUSING AGRICULTURAL BUSINESS 2 YEARS FROM NOW. I SEE IT LIKE REX BURG LELAND, YEARS AGO, AND AMERICAN WAREHOUSE IN FRESNO [sic] CA [sic]. THEY DID NOT COMPLY, SO THE COMPANIES MOVED OUT! AND I AM GOING TO HAVE THE CLOUT BEHIND [sic]!

I LOOK FORWARD TO YOUR REPLY!

PHIL CASCIO, JR

Aside from this letter, Investments also alleges that Cascio contacted U.S. Ag, ultimately inducing U.S. Ag to move from a building owned by Investments and into one of Cascio's facilities. Additionally, Invesments alleges that Cascio violated the NCA by failing to promptly cancel the C-Rental trade name.

¶11. Cascio moved for summary judgment, arguing that the NCA was unenforceable, that Investments sustained no damages and that Investments lacked standing to assert the provision intended to protect C-Rental. The circuit court denied the motion, and the case

proceeded to a bench trial. On March 19, 2019, the circuit court entered its Findings of Fact and Conclusions of Law and found that "the settlement agreement reached between the parties in the Chancery Court matter and specifically the December 15, 2015, Non-Competition Agreement was and is a valid and enforceable contract." In doing so, the circuit court found Cascio's testimony that he had not read the NCA to be "unbelievable." The circuit court further found that Cascio "did willfully and maliciously breach the Non-Competition agreement" and awarded Investments monetary damages, injunctive relief and attorneys' fees.

¶12. Those awards to Investments include $53,665.28 in actual damages for Cascio's contact with CSW, $4,800 in actual damages for Cascio's contacts with U.S. Ag and two awards of $2,000 in nominal damages for Cascio's contacts with Aramark and Baker. As for Cascio's contacts with Beulah Land, the circuit court did not award any damages because Investments had terminated the lease and ordered Beulah Land to vacate the premises. Also, injunctive relief was awarded by extending the NCA for Cascio's failure to cancel the C-Rental trade name. The circuit court also awarded $232,455.43 in attorneys' fees. Finally, because the circuit court found Cascio breached the NCA with willful and malicious intent, the circuit court ordered a later hearing to determine if punitive damages would be awarded. The circuit court ultimately held a punitive-damages hearing and found that punitive damages were necessary to deter Cascio from future breaches. The circuit court found that a punitive-damage award of $880,000 was reasonable but subsequently reduced that award to $650,000 because of the punitive-damages cap. The total judgment awarded $944,920.71 to

8

Investments.

¶13.    Cascio now appeals the circuit court's judgment, and Investments cross-appeals.

**ISSUES PRESENTED** [2]

¶14.    As previously mentioned, this case involves a direct appeal by Cascio and also a cross-appeal by Investments. The direct appeal focuses on the following nine issues:

I.      Whether the NCA is valid and enforceable.

II.     Whether consideration is required to support changes made to the NCA.

III.    Whether Investments properly filed the lawsuit to enforce the NCA.

IV.     Whether communications made by Cascio with CSW regarding a sprinkler system breached the NCA.

V.      Whether substantial evidence supports an award of actual damages.

VI.     Whether an award of nominal damages constitutes double recovery here.

VII.    Whether an award of injunctive relief is procedurally and substantively valid.

VIII.   Whether an award of punitive damages is warranted.

IX.     Whether an award of attorneys' fees is warranted.

The cross-appeal focuses on the following three issues:

I.      Whether Investments waived a challenge to the punitive-damages cap.

II.     Whether the punitive-damages cap is unconstitutional.

III.    Whether the trial court erred by failing to grant a permanent injunction enjoining violations of the NCA.

---

[2] This section reflects the issues the parties have raised, but the issues as stated here have been reworded for efficiency.

## STANDARD OF REVIEW

¶15.   "On appeal, we give a circuit-court judge presiding in a bench trial 'the same deference with regard to his findings as a chancellor.'" *Falkner v. Stubbs*, 121 So. 3d 899, 902 (Miss. 2013) (quoting *City of Jackson v. Perry*, 764 So. 2d 373, 376 (Miss. 2000)). "Therefore, we review the circuit court's interpretation and application of the law de novo, and its findings of fact will not be reversed if supported by substantial evidence." *Id.* (citing *Davis v. Smith (In re Estate of Smith)*, 69 So. 3d 1, 4 (Miss. 2011)).[3]

## DISCUSSION OF THE DIRECT APPEAL

### I.      The NCA is valid and enforceable.[4]

¶16.   Cascio argues that the NCA is invalid and therefore unenforceable because the court never approved the NCA.  To bolster this argument, he points to Mississippi Code Section 79-29-1111 (Rev. 2013), which provides that "[a] derivative proceeding may not be

---

[3] We note that on numerous occasions in the record, the circuit court made specific credibility determinations as to the testimony of Cascio.  The circuit court clearly found Cascio's testimony lacking in credibility and sometimes went as far as finding that Cascio's testimony had been fabricated.  As always, the circuit court in a bench trial is tasked with determining the credibility of the witnesses.  *Culbreath v. Johnson*, 427 So. 2d 705, 708 (Miss. 1983).  Here, the circuit court had the right to, and clearly did, take Cascio's credibility into account.

[4] The circuit court applied judicial estoppel to Cascio's argument that the NCA is invalid.  The circuit court reasoned that "by attacking the 'approval' procedure in the prior derivative litigation, Defendant Cascio is actually attacking the 'Agreed Final Judgement.' Defendant Cascio should be judicially estopped from attacking the 'Agreed Final Judgment.'" (citing *Clark v. Neese*, 131 So. 3d 556, 560, 562 (Miss. 2013) ("The purpose of judicial estoppel is to prevent parties from knowingly taking a position in one court that is contrary to a position that the party asserted in, and that has been accepted by, another court.")).  Here, while Cascio attacks the chancellor's Agreed Final Judgment, he never attempted to vacate that decision by posttrial motion, and he also never attempted to appeal it.  Therefore, this Court agrees that judicial estoppel applies here.

10

discontinued or settled without the court's approval." For the following reasons, we conclude that the NCA is valid and should be enforced against Cascio.

¶17.    Specifically, Cascio argues that "modifications" were never court approved. Cascio and his sisters began the process of settling the 2014 litigation in October of 2015. That settlement agreement was first court approved, as required by Mississippi Code Section 79-29-1111, on December 10, 2015. Even though the chancery court approved the parties' settlement, including the requirement of an NCA, the actual NCA was not formally signed by Cascio until December 15, 2015.

¶18.    Not until January 11, 2016, did the 2014 litigation officially end when the chancellor issued his Agreed Final Judgment. This order finally approved of the entire settlement agreement as required by Section 79-29-1111. Further, the circuit court in this suit determined that "the Chancery Court by 'Agreed Final Judgment' dated January 11, 2016, approved the settlement of the derivative action." The circuit court went on to determine that the "Non-Competition Agreement was part of a comprehensive settlement involving many documents." The circuit court specifically found that "[Cascio's] testimony that the Non-Competition Agreement was not agreed to or signed by some mistake is not believable." Thus, the circuit court found that "by a preponderance of the credible evidence that a valid and binding contract (the Non-Competition Agreement signed by Defendant Cascio and dated December 15, 2015) existed."

¶19.    Indeed, the NCA did look different than what the parties initially outlined during their settlement conference in October of 2015. Thus, Cascio argues that because he never read

11

the final terms of the NCA, he should not be bound by it. Nevertheless, the fact remains that Cascio did sign the NCA on December 15, 2015. *See Terminix Int'l, Inc. v. Rice*, 904 So. 2d 1051, 1056 (Miss. 2004) (enforcing a written and signed contract even though a party never read the contract (citing *McKenzie Check Advance of Miss., LLC v. Hardy*, 866 So. 2d 446, 455 (Miss. 2004))). Additionally, the circuit court also found Cascio's testimony "regarding his lack of knowledge of the December 15, 2015, additions to be unbelievable." It is well established that "a person is charged with knowing the contents of any document that he executes." *Russell v. Performance Toyota, Inc.*, 826 So. 2d 719, 726 (Miss. 2002) (citing *J.R. Watkins Co. v. Runnels*, 252 Miss. 87, 172 So. 2d 567, 571 (1965)) ("A person cannot avoid a written contract which he has entered into on the ground that he did not read it or have it read to him." (internal quotation marks omitted) (quoting *Runnels*, 172 So. 2d at 571))). Therefore, this Court concludes that having signed the NCA, Cascio is bound by its terms.

**II.     Consideration is not required to support changes made to the NCA.**

¶20.    Next, Cascio argues that he never received consideration for the changes or modifications to the NCA. Cascio's argument here mischaracterizes the facts, and we conclude that the argument has no merit.

¶21.    Here, Cascio signed the NCA on December 15, 2015. At no point after this time was the NCA modified. Cascio merely dislikes certain terms that were present when he signed the NCA. Even still, and as alluded to in the previous section, Cascio voluntarily signed the NCA on December 15, 2015, and, in doing so, he cannot avoid its enforcement. *See Russell*,

826 So. 2d at 726 (citing *Runnels*, 172 So. 2d at 571).

¶22.    Also, to be clear, Cascio did receive consideration for the NCA. That consideration was the settlement. *See Frierson v. Delta Outdoor, Inc.*, 794 So. 2d 220, 224 (Miss. 2001) ("All that is needed to constitute valid consideration to support a contract is a benefit to the promisor or a detriment to the promisee." (citing *Am. Olean Tile Co. v. Morton*, 247 Miss. 886, 893, 157 So. 2d 788, 790 (1963))). Specifically, Cascio received consideration because, as found by the circuit court, Cascio benefitted from the settlement of the 2014 litigation with his sisters. Therefore, this Court concludes that Cascio did receive proper consideration for the NCA.

**III.    Investments properly filed the lawsuit to enforce the NCA.**

¶23.    Cascio argues that Investments improperly filed this case because Jackie's then husband, Kenneth Pearson, signed the complaint. Cascio further argues that by signing the complaint, Kenneth Pearson filed the complaint without possessing authority to do so. Again, Cascio mischaracterizes the facts.

¶24.    While it is correct that the signature of Kenneth Pearson was included in the complaint, it is incorrect that he filed the complaint. Initially, Investments included Kenneth Pearson's signature pursuant to Mississippi Rule of Civil Procedure 65(b), which requires a "verified complaint" for a party to receive a temporary restraining order. Thus, at that time, Kenneth Pearson's role was merely to verify the allegations in the complaint. *Id.* Ultimately, however, Kenneth Pearson's signature was unnecessary because Investments elected to forgo the temporary restraining order.

13

¶25.    Instead, Investments properly filed the complaint pursuant to Mississippi Rule of Civil Procedure 11(a), which requires that "[e]very pleading or motion of a party represented by an attorney shall be signed by at least one attorney of record[.]"  Here, Investments' attorney signed the complaint when it was filed, and therefore the lawsuit was properly filed.

¶26.    The circuit court, however, apparently agreed with Cascio's argument and joined his two sisters as plaintiffs.  Cascio argues that this was also improper.

¶27.    This Court addresses joinder issues under "a deferential standard of review." *Crossfield Prods. Corp. v. Irby*, 910 So. 2d 498, 500 (Miss. 2005) (citing *Janssen Pharmaceutica, Inc. v. Bailey*, 878 So. 2d 31, 45 (Miss. 2004)). Yet even under this Court's deferential standard, "[i]t is fundamental corporation and agency law that a corporation's shareholder and contracting officer has no rights and is exposed to no liability under the corporation's contracts." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 471, 126 S. Ct. 1246, 163 L. Ed. 2d 1069 (2006).  Recently, this Court held that the owner of LLCs lacked standing to bring suit to enforce a contract "because any obligations under the alleged contracts are to the LLCs, not [the owner] personally." *Rosenfelt v. Miss. Dev. Auth.*, 262 So. 3d 511, 514 (Miss. 2018) (citing *Bruno v. Se. Servs. Inc.*, 385 So. 2d 620, 622 (Miss. 1980)).  *Rosenfelt* further held that "[u]nder Mississippi law, 'an action to redress injuries to a corporation, whether arising in contract or in tort[,] cannot be maintained by a stockholder in his own name, but must be brought by the corporation because the action belongs to the corporation and not the individual stockholders whose rights are merely derivative.'" *Id.* at 517 (alteration in original) (quoting *Bruno*, 385 So. 2d at 622).

14

¶28.   Thus, by joining Cascio's sisters to the case, the sisters are entitled to any relief granted.   Joinder, therefore, created a problem because the sisters were never parties to the NCA, and Cascio's breach of the NCA provides no claim for either sister.   Instead, only Investments, CSW, and C-Rental may bring a claim for Cascio's breach of the NCA. Therefore, we determine that the circuit court erred by joining the sisters.   However, there is no need for further action other than removing Jackie and Phyllis from the judgment as they were not awarded any separate damages other than those recoverable by the company. As for the filing of the lawsuit, this Court concludes that it was filed correctly by Investments and that joinder of the sisters, although improper, was unnecessary.

### IV.    Cascio's threatening letter to CSW regarding the sprinkler system breached the NCA.

¶29.   First, Cascio argues that the circuit court erred "in finding that Cascio was prohibited from contacting his own company" regarding the letter Cascio sent to CSW.   Second, Cascio argues that NCA is too broad because of the no-contact provision's language "without regard to geographical limits" and also for its "any purpose" language.   Regarding the letter, Investments contends that Cascio was never prohibited from contacting CSW under the NCA.   As for Cascio's argument that the NCA is overbroad,  Investments counters by arguing that the NCA is not broad considering it is limited to ten customers.

¶30.   When a court interprets a contract, the first thing that court must do is determine if the contract is ambiguous, "and if it is not, then it must be enforced as written." *Epperson v. SOUTHBank*, 93 So. 3d 10, 16 (Miss. 2012) (citing *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748 (Miss. 2003)).   Intent is the key in assessing

15

ambiguity. *Royer Homes*, 857 So. 2d at 752 (citing *Cooper v. Crabb*, 587 So. 2d 236, 241 (Miss. 1991)). Courts may not infer intent contrary to the text of the contract. *Id.* (citing *Simmons v. Bank of Miss.*, 593 So. 2d 40, 42-43 (Miss. 1992)).

¶31. Cascio's first argument centers around a threatening letter Cascio sent to Terry Hughes, president of CSW. In his letter, Cascio demanded that certain facilities used by CSW to store chemicals install a sprinkler system. Cascio's primary threat was to take his complaints to the fire marshal and to the chemical companies. Cascio made sure to point out that a high-powered law firm was advising him. Upon receiving this letter, Hughes recommended to Cascio's sisters, Jackie and Phyllis, that Investments purchase and install the sprinkler system, which they agreed to do.[5]

¶32. The circuit court detailed certain damages caused by Cascio and incurred by Investments. Specifically, the circuit court found that "due to [Cascio's] threatening letter regarding the sprinkler system [Investments] paid the amount of $53,665.28; $53,665.28 is awarded as reasonable compensation for injuries actually sustained by [Investments]."

¶33. Here, Cascio argues that the circuit court should not have found that Cascio was prohibited from contacting CSW. The circuit court, however, did not find that Cascio had violated a provision of the NCA restricting him from contacting CSW "for any purpose." Nowhere within the text of the NCA is Cascio outright prohibited from contacting CSW, a company in which he has a pecuniary interest.[6] Rather, Cascio violated the more specific

---

[5] The threatening letter Cascio sent to CSW is quoted verbatim in paragraph 10.

[6] Additionally, a shareholder is not prohibited from contracting away rights of control as Cascio did here by executing the NCA. *See* **Fought v. Morris**, 543 So. 2d 167, 171

prohibition of encouraging (through threats) CSW, a customer of Investments, to solicit changes that adversely impacted Investments financially. Therefore, according to the text of the NCA, *see **Royer Homes***, 857 So. 2d at 752 (citing ***Simmons***, 593 So. 2d at 42-43), we conclude that Cascio was not prohibited from contacting "his own company," as Cascio claims, but rather, he violated the NCA by effectuating a financially detrimental act by Investments through threats and intimidation. Justice Griffis's separate opinion treats Cascio's letter as standard correspondence leading Terry Hughes to make an independent business decision despite no testimony from Hughes or anyone else to support this conclusion. Griffis CDIP Op. ¶¶ 95-100. While it would have been beneficial for the circuit court to have been more thorough in its findings of fact, its conclusion is clearly supported by the evidence. Cascio's threats led to Hughes's recommendation that was then relied upon by Investments.

¶34.    As for the NCA specifically, this Court has held that,

> Non-competition agreements have been viewed by this Court as "restrictive contracts [which] are in restraint of trade and individual freedom and are not favorites of the law." ***Frierson v. Sheppard Building Supply, Co.***, 247 Miss. 157, 172, 154 So. 2d 151, 156 (1963). *See also **Texas Road Boring Co. v. Parker***, 194 So. 2d 885, 888 (Miss. 1967). Only when such agreements are reasonable will they be considered valid and upheld by this Court. ***Frierson***, 247 Miss. at 172, 154 So. 2d at 156. The validity and the enforceability of a non-competition agreement are largely predicated upon the reasonableness and specificity of its terms, primarily, the duration of the restriction and its geographic scope. ***Empiregas, Inc. v. Bain***, 599 So. 2d 971, 975 (Miss. 1992); ***Redd Pest Control Co. v. Heatherly***, 248 Miss. 34, 157 So. 2d 133 (1963).

---

(Miss. 1989) (holding that a shareholder's "blind adherence to corporate statutes may not be used to circumvent the corporation's by-laws, charter or various *agreements*[.]" (emphasis added)).

*Kennedy v. Metro. Life Ins. Co.*, 759 So. 2d 362, 364 (Miss. 2000) (alteration in original). Cascio argues that the NCA is overbroad, but he fails to recognize the actual limited scope of the NCA. While the NCA prohibits Cascio from contacting Investments' customers without regard to a geographic limit and for any purpose, Investments only has ten customers. Aside from these ten customers, the NCA does not bar Cascio from contacting any other entity. The circuit court found that the geographical limitations within the NCA are reasonable. Therefore, this Court, too, concludes that the NCA is reasonable and is not overbroad. *See Kennedy*, 759 So. 2d at 364.

**V.      Whether substantial evidence supports an award of actual damages.**

¶35.    Next, Cascio contends that the circuit court erred by finding that his letter to CSW caused actual damages. Specifically, Cascio argues that the letter he sent to Hughes did not proximately cause the purchase of the sprinkler system but that "the decision to install the sprinkler system was made with the recommendation and advice of CSW's trusted President," Terry Hughes. Investments argues that "[i]t is undisputed that [Cascio's] letter prompted Hughes to demand the sprinklers be installed . . . . It was [Cascio], and not Hughes, who set off this unbroken chain of events proximately causing Cascio Investments' damages."

¶36.    At first glance, Cascio appears to have a good argument. His communication with Hughes arguably concerned improving or benefitting CSW. In *Tallahatchie Valley Electric Power Association v. Mississippi Propane Gas Association, Inc.*, a plaintiff sought declaratory and injunctive relief against a competitor for entering into a market and allegedly

18

causing a loss of business. ***Tallahatchie Valley Elec. Power Ass'n v. Miss. Propane Gas Ass'n, Inc.***, 812 So. 2d 912 (Miss. 2002). This Court held that any loss of customers, or "competitive 'damage'" suffered by the plaintiff "is not the basis of a cause of action since it is *damnum absque injuria*—a damage not consequent upon the violation of any right recognized by law." ***Id.*** at 925; *cf. Mississippi Practice Series: Trial Handbook for Lawyers* § 32:1 (3d ed.), Westlaw (database updated Oct. 2020) ("Thus, where a person suffers injury as a result of lawful actions of others for which no damages may be recovered, the principle of law is known as *damnum absque injuria*." (citing 22 Am. Jur. 2d *Damages* § 2, Westlaw (database updated Feb. 2021))). Unlike the plaintiff in ***Tallahatchie Valley***, however, Investments can base its claim "upon the violation of any right recognized by law." ***Tallahatchie Valley***, 812 So. 2d at 925. The violation is Cascio's breach of the NCA, which, as previously recognized, is a valid legal agreement entered into by Cascio.

¶37. The circuit court found that "due to [Cascio]'s threatening letter regarding the sprinkler system [Investments] paid the amount of $53,665.28; $53,665.28 is awarded as reasonable compensation for injuries actually sustained by [Investments]" to purchase the sprinkler system. This Court has stated before that "[p]roximate cause of an injury is that cause which in natural and continuous sequence unbroken by any efficient intervening cause produces the injury and without which the result would not have occurred." ***Delahoussaye v. Mary Mahoney's, Inc.***, 783 So. 2d 666, 671 (Miss. 2001) (citing ***Grisham v. John Q. Long V.F.W. Post***, 519 So. 2d 413, 417 (Miss. 1988)).

¶38. Cascio attempts to restrict proximate cause to the recommendation made by Hughes.

As the trial court stated, however, the sprinkler system was purchased "due to [Cascio's] threatening letter." Therefore, based on Cascio's threatening letter to CSW that put in motion a "natural and continuous sequence" constituting proximate cause, as well as substantial evidence regarding Cascio's intent and credibility, we conclude that the circuit court did not err by awarding actual damages. Cascio further argues that the sprinkler system was an improvement to the property and, therefore, the award was a windfall for Investments. Justice Griffis attempts to establish some benefit to Investments through generic testimony that the sprinkler system improved the property. Griffis CDIP Op. ¶¶ 116-18. However, there was no credible evidence presented that the sprinkler system was necessary or in any way improved the value of the property. To the contrary, testimony was adduced that Investments had not realized any monetary benefit from the installation.

¶39. Cascio next argues that the circuit court erred by finding that his contact with U.S. Ag caused actual damages. Cascio asked U.S. Ag to move out of Investments' property and into his, which U.S. Ag did. While U.S. Ag ultimately moved back into Investments' property, it did so with a rent reduction. The circuit court awarded $4,800 in actual damages to compensate for the reduction in rent.

¶40. Cascio argues that the rent reduction occurred in exchange for an extension of the lease. Investments contends that the rent reduction was required to compensate U.S. Ag for its multiple moves. The record shows that the "the break on the rent was for [U.S. Ag's] trouble," for moving in and out of the Cascio's facility, and the trial court found that the reduced rent was "proximately caused by [Cascio's] actions and communications with [U.S.

20

Ag]." *See Delahoussaye*, 783 So. 2d at 671.  Therefore, this Court concludes that the circuit court's decision was based on substantial evidence.

### VI.   The award of nominal damages does not constitute a double recovery.

¶41.   The circuit court found that Cascio also breached the NCA by contacting Aramark and Baker.  However, the court only awarded $2000 in nominal damages for each contact.  Cascio argues that Investments should not be entitled to nominal damages and actual damages in the same case.  Investments contends that Cascio's argument is correct only as to the same claim.  Since the nominal damages arose from different claims, that is Cascio's contacts with Aramark and Baker, Investments argues that no double recovery can be had.

¶42.   "[W]here a suit is brought for a breach of a contract, and the evidence sustains the claim, the complainant is entitled to recover at least nominal damages for the failure of the defendant to carry out his agreement." *Bus. Commc'ns, Inc. v. Banks*, 90 So. 3d 1221, 1226 (Miss. 2012) (alteration in original) (internal quotation marks omitted) (quoting *Callicott v. Gresham*, 249 Miss. 103, 112, 161 So. 2d 183, 186 (1964)).  Further, a claimant cannot receive actual and nominal damages from the same claim.  *ACI Chems., Inc. v. Metaplex, Inc.*, 615 So. 2d 1192, 1202 (Miss. 1993).  While actual damages were awarded, those actual damages were awarded for different claims that had nothing to do with Cascio's contacts with Aramark and Baker.  It follows that since the circuit court found Cascio in breach for contacting Aramark and Baker but did not award actual damages, at least nominal damages should be awarded.  *See Banks*, 90 So. 3d at 1226 (quoting *Callicott*, 161 So. 2d at 186).  Therefore, we conclude that the circuit court did not err by awarding nominal damages for

21

Cascio's contacts with Aramark and Baker.

**VII.    The award of injunctive relief is valid.**

¶43.    Cascio makes an array of arguments contending that the circuit court erred by awarding injunctive relief based on Cascio's failure to cancel the C-Rental trade name. Here, Cascio was required to cancel the C-Rental trade name under the NCA. While Cascio signed the NCA on December 15, 2015, he did not cancel the trade name until September 25, 2018. Thus, the circuit court awarded injunctive relief by extending the duration of the NCA.

¶44.    First, Cascio contends that Investments lacked standing to bring the action because the violation was directed toward a nonparty to the suit, C-Rental. It appears that Cascio attempts to argue that only C-Rental has standing to sue for the C-Rental trade-name breach, and since C-Rental is not a party to this suit, Investments lacks standing. Investments counters by asserting that Mississippi's standing requirements are very broad. *Beard v. City of Ridgeland*, 245 So. 3d 380, 393 (Miss. 2018) (reiterating that standing requirements in Mississippi are "quite liberal." (internal quotation marks omitted) (quoting *Hall v. City of Ridgeland*, 37 So. 3d 25, 34 (Miss. 2010))). Investments further asserts that as a party to the settlement, which included the NCA, Investments has standing to enforce the NCA against Cascio. This Court agrees that as a party to the settlement, Investments has standing to enforce the NCA against Cascio, including a claim for his failure to cancel the C-Rental trade name pursuant to the NCA. *Id.*

¶45.    Second, Cascio argues that the injunction is facially invalid and overbroad. Cascio contends that the injunction is facially invalid because it is not clear in stating what he must

22

do. Cascio argues that the injunction is overbroad because it protects C-Rental and CSW, not just Investments, and also because the injunction extends the entire NCA, not just the period of noncompetition. Investments contends that the injunction is clear because it does exactly what the NCA extension provision says to do: extend the noncompetition requirements against Cascio. Investments argues that the injunction merely mirrors the extension provision, so it cannot be overbroad. Also, Investments contends that extending the NCA versus extending the period of noncompetition means the same thing. This Court has held that when a contract is clear and unambiguous, a judge should not be "so concerned with what the parties may have meant or intended but rather what they said, for the language employed in a contract is the surest guide to what was intended." *Shaw v. Burchfield*, 481 So. 2d 247, 252 (Miss. 1985) (citing *Landry v. Moody Grisham Agency, Inc.*, 254 Miss. 363, 375, 181 So. 2d 134, 139 (1965)). Therefore, as Investments points out, the injunction merely reflects the requirements found within NCA, and therefore we conclude the injunction is valid.

¶46. Third, Cascio argues that the NCA was never specific enough to determine the injunction's duration. The NCA provides that the extension is to be determined based on the time period Cascio was in breach. Pursuant to the NCA, the trial court awarded the injunction based on the time Cascio was in breach. The record shows that Cascio signed the NCA on December 15, 2015, but did not cancel the C-Rental trade name until September 25, 2018. Therefore, this Court concludes that the circuit court had substantial evidence to support extending the NCA for the time period specified.

23

¶47. Fourth, Cascio contends that the method for determining the duration was procedurally invalid. Specifically, Cascio argues that the trial court never made factual findings regarding the duration as required by Mississippi Rule of Civil Procedure 52(a). Rule 52(a) requires that a trial court "find the facts specially and state separately its conclusions of law thereon and judgment shall be entered accordingly." Further, this Court has held that "[a] trial court is under no obligation under Rule 52(a) to make particularized findings of fact and conclusions of law; generalized findings of fact and conclusions of law, while not as helpful to appellate review, comply with the mandate of Rule 52(a) even when a party requests particularized findings." *Smith v. Hickman, Goza & Spragins, PLLC*, 265 So. 3d 139, 145 (Miss. 2019) (citing *Century 21 Deep S. Props., Ltd. v. Corson*, 612 So. 2d 359, 367 (Miss. 1992)). The record shows three times the circuit found an injunction necessary—once in a March 21, 2019 order, once in a September 19, 2019 order and once in a November 15, 2019 order. Each finding was supported by facts and the applicable law. While the circuit court may not have entered a particularized finding regarding the injunction, the circuit court awarded the injunction and based that award on the evidence presented. Therefore, we conclude that the circuit court did not fail to make more specific findings regarding the injunction.

### VIII. Whether an award of punitive damages is warranted.

¶48. Cascio makes various arguments that the circuit court erred by awarding punitive damages. First, Cascio asserts that the punitive-damages phase was never bifurcated from the compensatory-damages phase and that the circuit court never held an evidentiary hearing

24

for punitive damages as required by Mississippi Code Section 11-1-65(1)(c) (Rev. 2019). The record, however, does not support Cascio's recollection of events. The circuit court, in its March 21, 2019 order, in concluding the compensatory-damages phase, specifically found the need to hold a later punitive-damages evidentiary hearing. That hearing was held on June 4, 2019, and afterwards the circuit court issued a separate order awarding punitive damages. Cascio's argument has no merit.

¶49. Second, Cascio argues that a punitive-damages award is invalidated by the joinder of his sisters to the case. Cascio argues the evidence focused on family "personal grievances" instead of "violative conduct of the NCA." As previously mentioned, the joinder of the sisters was harmless. Even still, the evidence presented is relevant to the issue in question: whether Cascio acted with malice in breaching the NCA. *See* Miss. Code Ann. § 11-1-65(1)(a) (Rev. 2019) ("Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual *malice*, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud."). Evidence of Cascio's actions towards the sisters, the sole shareholders, is relevant and, under the facts of this case, indivisible from the evidence of his actions against the actual company as it relates to malice. Further, the circuit court specifically found that Cascio "breached the Non-Competition Agreement at least eighty five (85) times" in a malicious manner. Because of Cascio's malicious behavior, the circuit court granted punitive damages to deter future breaches by Cascio. Therefore, we conclude that the evidence, even if it resulted from the

25

erroneous joinder, was relevant to an award of punitive damages and was, therefore, admissible and proper.[7]

¶50.    Third, Cascio argues that the punitive damages were excessive.  In *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003), the Supreme Court of the United States articulated the standard for determining whether an award of punitive damages is excessive.  While the Court reasoned that it would not "impose a bright-line ratio which a punitive damages award cannot exceed[,]" *id.* at 425, the Court did, however, state that "[s]ingle-digit multipliers are more likely to comport with due process[.]" *Id.* at 425 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582, 116 S. Ct. 1589, 1602, 134 L. Ed. 2d 809 (1996)).  Here, the record reveals that the ratio, after the punitive damages were reduced pursuant to the cap, is slightly higher than 2:1.  In addition, the ratio is not the only determining factor, rather, "reprehensibility" is "the most important indicium of a punitive damages award's reasonableness." *Id.* at 418. The circuit court, here, found Cascio wanted to "put his sisters out of business" and "[t]hat is a reprehensible act by any definition."  This Court concludes that the circuit court did not err by awarding the amount of punitive damages awarded because it was supported by the evidence and the caselaw.

¶51.    Finally, Cascio argues that the punitive damages were not rationally related to the harm suffered. Mississippi Code Section 11-1-65(f)(ii)(1) (Rev. 2019) requires a "reasonable

---

[7] Again, as explained above, the joinder problem is solved by merely removing the names of the sisters from the judgment, which is what we order today.

relationship between the punitive damage award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred[.]" As previously mentioned, the circuit court found that the punitive damages were necessary because of Cascio's reprehensible conduct. Specifically, the circuit court found "that [Cascio] willfully, maliciously and in reckless disregard for the rights of the Plaintiffs breached the Non-Competition Agreement on at least eighty-five (85) times." Therefore, we conclude that the award was reasonably and rationally related to the harm suffered.

### IX. Whether an award of attorneys' fees is warranted.

¶52. Cascio argues that attorneys' fees are not warranted because the circuit court failed to perform an analysis under *McKee v. McKee*, 418 So. 2d 764 (Miss. 1982). When a court determines whether to award attorneys' fees, *McKee* held that

> The fee depends on consideration of, in addition to the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case.

*McKee*, 418 So. 2d at 767. As Investments suggests, in *Varner v. Varner*, this Court held that attorneys' fees may be awarded even though "the record does not reflect [that a court] specifically applied the *McKee* factors to this case." *Varner v. Varner*, 666 So. 2d 493, 498 (Miss. 1995). Further, *Varner* affirmed the award of attorneys' fees because there was no manifest error. *Id.* Here, substantial evidence supported an award of attorneys' fees. Investments provided invoices, Jackie testified to those invoices, and the circuit determined, citing *McKee*, that an award of attorneys' fees is "a reasonable and fair amount for attorneys

27

fees in this matter and the amount satisfies the requirement of the law." We find no error in this analysis.

¶53. Cascio further argues that the circuit court erred by awarding attorneys' fees because that award reflects services performed during the punitive-damages phase. This Court, however, has upheld an award of attorneys' fees for services done after trial. *See Hatfield v. Deer Haven Homeowners Ass'n, Inc.*, 234 So. 3d 1269, 1277 (Miss. 2017). Further, attorneys' fees have been upheld as *the* punitive damages by our Court of Appeals, which we agree was correct. *See Raines v. Bottrell Ins. Agency, Inc.*, 992 So. 2d 642, 648 (Miss. Ct. App. 2008). If attorneys' fees may be awarded for services after trial and also as the actual punitive-damage award, then it follows that attorneys' fees may be awarded for services performed during the punitive-damage phase, even before the final judgment has been entered. Therefore, this Court concludes that the circuit court did not err in the amount awarded as attorneys' fees.

## DISCUSSION OF THE CROSS-APPEAL

### I. Investments' constitutional challenge to the punitive-damages cap is procedurally barred.

¶54. Investments argues that the punitive-damages cap in Mississippi Code Section 11-1-65(3)(a) (Rev. 2019) is unconstitutional. Rule 24(d) of the Mississippi Rules of Civil Procedure "requires that proper notice be given to the Attorney General when the constitutionality of a statute is challenged 'to afford him an opportunity to intervene and argue the question of constitutionality.'" *Barnes v. Singing River Hosp. Sys.*, 733 So. 2d 199, 202 (Miss. 1999) (quoting M.R.C.P. 24(d)). As found by the circuit court, "notice was

28

not given to the Attorney General pursuant to [M.R.C.P. 24(d)] and as [Investments] challenged the constitutionality of this statute (not merely its application), this court may not consider [Investments'] constitutional challenge."

¶55. Investments' argument regarding the constitutionality of the punitive-damages cap is raised for the first time on appeal. It is a well-settled rule that the "constitutionality of a statute will not be considered unless the point is specifically pleaded." *Estate of Gibson v. Magnolia Healthcare, Inc.*, 91 So. 3d 616, 632 (Miss. 2012) (internal quotation marks omitted) (quoting *Smith v. Fluor Corp.*, 514 So. 2d 1227, 1232 (Miss. 1987)). "[T]his Court has also consistently held that errors raised for the first time on appeal will not be considered, especially where constitutional questions are concerned." *Id.* at 632 (alteration in original) (internal quotation marks omitted) (quoting *Stockstill v. State*, 854 So. 2d 1017, 1023 (Miss. 2003)). This Court will depart from that rule only in "'unusual circumstances,' which are not present in this case." *Id.* at 632 (quoting *Cockrell v. Pearl River Valley Water Supply Dist.*, 865 So. 2d 357, 360 (Miss. 2004)). Thus, this issue is procedurally barred on appeal.

## II. Whether the punitive-damages cap is unconstitutional.

¶56. We decline to address this specific issue for the reasons stated in section I of this discussion of the cross-appeal.

## III. The circuit court did not err by failing to grant additional injunctive relief.

¶57. Investments contends that the circuit court erred by failing to grant an additional injunction that would specifically enjoin Cascio from committing *future* violations of the NCA. Under this injunction, Investments would only need to move to hold Cascio in

contempt of the injunction as opposed to filing a new lawsuit. Thus, it appears Investments is making an argument of efficiency. Investments, however, cites no authority in support its argument that such an injunction is required or allowed under the circumstances. It is has long been settled that failure to cite authority to support a claim "precludes this Court from considering the specific claim on appeal." *Tupelo Redevelopment Agency v. Gray Corp., Inc.*, 972 So. 2d 495, 514 (Miss. 2007) (citing *Grey v. Grey*, 638 So. 2d 488, 491 (Miss. 1994)). There was no error in failing to grant additional injunctive relief.

## ATTORNEYS' FEES ON APPEAL

¶58. Investments request attorneys' fees for their successful prosecution of this appeal. Cascio opposes the award requested as well as its amount. After due consideration, we find that the motion should be granted in part and denied in part.

¶59. "Where a contract provides for an award of attorney fees, fees are awarded in the trial court, and the appellee successfully defends that award on appeal, this Court has awarded fees incurred in litigating the appeal upon motion by the appellee." *Hatfield v. Deer Haven Homeowners Ass'n, Inc.*, 234 So. 3d 1269, 1277 (Miss. 2017) (citing *Knight v. McCain*, 531 So. 2d 590, 597 (Miss. 1988)). "When a prevailing party requests attorneys' fees on appeal, '[t]ypically, th[e] Court awards attorney fees on appeal in an amount equal to half the amount awarded at trial.'" *Gibson v. Bell*, 312 So. 3d 318, 325 (Miss. 2020) (alterations in original) (internal quotation marks omitted) (quoting *Latham v. Latham*, 261 So. 3d 1110, 1115 (Miss. 2019)). However, this Court has held that the better practice would be for the party seeking attorneys' fees on appeal to file a motion in this Court, supported by affidavits

30

and time records that establish the actual fees expended on appeal. *Hatfield*, 234 So. 3d at 1277; *see also Hatfield*, 234 So. 3d at 1278 (Chamberlin, J., concurring in part) (suggesting that appellate counsel, like trial counsel, should be required to provide evidentiary support for an award of attorneys' fees (quoting *Key Constructors, Inc. v. H & M Gas. Co.*, 537 So. 2d 1318, 1325 (Miss. 1989))).

¶60. Investments' motion for $148,765.52 in attorneys' fees and expenses is made in addition to the $232,455.43 awarded by the Washington County Circuit Court. The circuit court awarded attorneys' fees in accordance with the noncompetition agreement, which contained an attorneys' fees provision. Additionally, Investments was entitled to an attorneys' fees award because they were awarded punitive damages. *See Raines*, 992 So. 2d at 648 (citing *Pride Oil Co., Inc. v. Tommy Brooks Oil Co.*, 761 So. 2d 187, 192 (Miss. 2000). The motion is accompanied by a detailed affidavit that includes billing statements for attorneys' fees and expenses that Investments asserts it incurred on appeal. Therefore, this Court has a specific quantified request upon which to base a fair determination.

¶61. This Court has declined to award attorneys' fees that were not incurred during the appeal. *See Gibson*, 312 So. 3d at 325 n.8. Here, while Investments request includes attorneys' fees and expenses incurred during this appeal, it also includes attorneys' fees and expenses incurred during preappeal litigation and in preparation of the instant motion. On appeal, only fees and expenses incurred in defense of the appeal may be awarded. *See Gibson*, 312 So. 3d at 325 (quoting *Latham*, 261 So. 3d at 1115). Also, Investments' request for attorneys' fees includes attorneys' fees and expenses incurred for prosecuting the cross-

31

appeal. While Investments prevailed on the direct appeal, it did not prevail on the cross-appeal. Again, only if a party prevails on appeal may that party receive an award of attorneys' fees. *See **Hatfield***, 234 So. 3d at 1277. Therefore, in this case, Investments' fees associated with preappeal litigation, the cross-appeal, and preparation of the instant motion are ineligible for the purposes of this award. Due to the burden of proof, hybrid entries are also not awarded. After careful review, we find an award of $88,590.06, which is less than half the amount awarded by the circuit court, constitutes a fair and just award of attorneys' fees and expenses incurred in defense of the appeal to this Court. *See **Gibson***, 312 So. 3d at 325-26.[8]

## CONCLUSION

¶62. Regarding the direct appeal, we conclude that substantial evidence supports the circuit court's findings, and the circuit court is affirmed as to all issues except the joinder of the Jackie and Phyllis as plaintiffs. The circuit court is reversed as to the joinder of Jackie and Phyllis as plaintiffs. However, because no separate damages were awarded to the Jackie and Phyllis, there is no need to remand the case. Jackie's and Phyllis's names are removed from the judgment. Investments remains the only plaintiff.

¶63. As for Investments' cross-appeal, the issue of the constitutionality of the punitive-damages cap is procedurally barred, and the circuit court is affirmed as to the denial of additional injunctive relief.

---

[8] A copy of the filed billing statements reflecting, by highlight, entries ineligible for purposes of this award and removed from the final award calculation is filed as a separate document in the office of the Clerk of this Court.

¶64. Finally, Investments is hereby awarded $88,590.06 in attorneys' fees for its successful defense of this appeal.

¶65. **ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND RENDERED IN PART. ON CROSS-APPEAL: AFFIRMED.**

**KITCHENS AND KING, P.JJ., MAXWELL, BEAM AND ISHEE, JJ., CONCUR. RANDOLPH, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. GRIFFIS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY COLEMAN, J.; RANDOLPH, C.J., JOINS IN PART.**

**RANDOLPH, CHIEF JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶66. I concur with the majority's resolution of issues I through III and VI through IX. I concur with the majority as to issue V to the extent it is addressed in paragraph 39 of the majority opinion. I additionally concur with the majority on all issues raised by way of cross-appeal. I do not join the majority on issue IV, and my dissent is limited to adopting paragraph 17 of the dissent.

**GRIFFIS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶67. Investments sued Cascio for breach of a noncompetition agreement (NCA). The trial court found one breach that accounted for a $4,800 actual loss of a customer by Investments, and the court awarded almost $1 million in the final judgment.[9] The evidence does not support this judgment.

---

[9] The final judgment awarded compensatory damages of $62,465.28, attorneys' fees of $232,455.43, and punitive damages of $650,000, for a total award of $944,920.71. Investments has filed a motion to award attorneys' fees and expenses incurred the conclusion of the punitive-damages phase and through this appeal in the amount of $148,765.52. If awarded, Investments attorneys' fees and expenses would be $381,220.95, and the total final judgment would be $1,093,686.23.

¶68. Despite the court's finding that "[a]t least eighty-five times [Cascio] tried to induce [Investments'] customers, existing tenants to long term leases, to move into buildings or onto property owed by Defendant Cascio," the court's "Damages" section in the findings identified only five entities.

¶69. The only entity that caused Investments an "actual loss" because of Cascio's attempt to induce a customer to leave Investments was US-Ag Recycling. The "Damages" section of the findings stated, "US-Ag Recycling: [Investments] has shown that the rental amounts were reduced . . . from $1,000.00 to $800.00 proximately caused by [Cascio]'s actions and communications with US-Ag; damages are awarded in the amount of $4,800.00 . . . ."

¶70. The court identified CSW in the "Damages" section. But the court did not find that Cascio induced CSW or any other customer through CSW to leave Investments. Instead, without explanation, the court found Cascio owed damages for Investments' decision to install a sprinkler system in one of Investments' properties.

¶71. The court identified another customer but found no breach by Cascio.[10] Then, the court identified two customers that Cascio attempted to induce to leave Investments but found no actual loss and awarded nominal damages.[11]

---

[10] The court identified "Beulah Land" as a customer. And, the court ruled, "[t]his lease was effectively terminated by [Investments] prior to [Cascio]'s actions by [Investments'] requesting Beulah to vacate the premises. No damages awarded."

[11] The court identified Aramark Uniform and Career Apparel, Inc., and Baker Distributing Company, LLC, as customers. But the court then ruled that Investments "did not prove by a preponderance of the credible evidence that [Cascio]'s breach of the [NCA] caused any actual loss, nominal damages only are awarded in the amount of $2,000.00." For Aramark and Baker, the court ruled that Investments did not suffer a loss but awarded a total nominal-damage award of $4,000.

34

¶72. Even though the court said there were eighty-five breaches of the NCA by Cascio, the court's findings only identified two instances of damages, other than nominal damages, by Investments. The court found only one breach that resulted in a actual loss because of Cascio's attempt to induce customers in breach of the NCA. And the court awarded $4,800 in damages for this "actual loss."

¶73. I address each of the issues as identified by the majority.

    *I.    The NCA is valid and enforceable.*

¶74. Cascio moved for summary judgment on the basis that the "non-contact" provision of the NCA was overbroad both as to geography and purpose. The court denied Cascio's motion and held the NCA was valid and enforceable.

¶75. Noncompetition agreements are "restrictive contracts in restraint of trade and individual freedom and are not favorites of the law." ***Tex. Rd. Boring Co. of La.-Miss. v. Parker***, 194 So. 2d 885, 888 (Miss. 1967) (quoting ***Frierson v. Sheppard Building Supply, Co.***, 154 So. 2d 151, 156 (Miss. 1963)); ***Thames v. Davis & Goulet Ins., Inc***., 420 So. 2d 1041, 1043 (Miss. 1982). Only when such agreements are reasonable will they be considered valid. ***Frierson***, 154 So. 2d at 156. The burden of proving the reasonableness of an agreement's terms is on the party seeking to enforce them. ***Kennedy v. Metro. Life Ins. Co.***, 759 So. 2d 362, 364 (Miss. 2000). When a noncompetition provision, even one entered into as a result of a business sale, purports to restrain conduct anywhere in the world, it is both unreasonable and unenforceable. *See, e.g.*, ***Easy Reach, Inc. v. Hub City Brush, Inc.***, 935 So. 2d 1140, 1143-45 (Miss. Ct. App. 2006) (noncompetition clause forbidding plaintiff from

manufacturing its product "everywhere" was unreasonable and unenforceable).

¶76. The relevant provision of the NCA is paragraph 3, and it states:

> For a period of five (5) years from the date of this Non-Competition Agreement neither the undersigned nor anyone acting in concert with the undersigned, whether directly or indirectly, will have any contact with any existing customer of CSW, Cascio Investments, LLC and/or C-Rental *for any purpose without regard to geographic limits* or shall by any means encourage any existing customer of CSW, Investments and/or C-Rental to terminate, reduce or otherwise adversely change, or affect that customer's business relationship with CSW, Investments and/or C-Rental.

(Emphasis added.)

¶77. This eighty-five word sentence is the essence of this litigation. It may be read in two parts. The first is a no-contact provision. Under this provision, Cascio or "anyone acting in concert with [him], whether directly or indirectly," may not "have any contact with any existing customer of CSW, Cascio Investments, LLC and/or C-Rental for any purpose *without regard to geographic limits* . . . ." (Emphasis added.)

¶78. Because the no-contact provision has no geographic limit, it is clearly unreasonable and unenforceable. *See Easy Reach, Inc.*, 935 So. 2d at 1143. There must be a geographic limit to be enforceable. The majority determined that the geographic limit is of no consequence because Investments only has ten customers. Regardless, if one of the customers wants Cascio to provide their storage needs in Wisconsin, the NCA should not prevent this potential business relationship by Cascio and Investments' customer.

¶79. The majority finds that the trial court did not rule that Cascio's letter to Hughes was a violation of the no-contact provision. Maj. Op. ¶ 33. However, the court's findings do not include any language to indicate the court found otherwise. If such is indeed the case, I agree

36

with the majority that the trial court did not use the no-contact provision to find that Cascio breached the NCA.

¶80.    Nevertheless, I am of the opinion that the no-contact provision was unreasonable and unenforceable due to its failure to establish geographic limits. I am also of the opinion that the court erred by extending the NCA for an additional five years with the no-contact provision in place. One actual loss in the amount of $4,800 is hardly support for extending the agreement for five years.  I would reverse as to this issue and render judgment finding the geographic limitation of the no-contact provision is unenforceable as a matter of law.

        II.      *Consideration is not required to support changes made to the NCA.*

¶81.    I concur with the majority opinion as to issue II.

        III.     *Investments properly filed the lawsuit to enforce the NCA.*

¶82.    I concur with the majority opinion as to issue III.

        IV.      *Cascio's threatening letter to CSW regarding the sprinkler system breached the NCA.*

¶83.    The evidence does not support a finding that Cascio's letter to CSW about the sprinkler system was a breach of the NCA. I respectfully dissent.

¶84.    The majority finds that Cascio breached the second part of paragraph 3 of the NCA. If we remove the language of the no-contact provision, paragraph 3 provides:

> For a period of five (5) years . . . neither [Cascio] nor anyone acting in concert with [Cascio], whether directly or indirectly, . . . shall by any means encourage any existing customer of CSW, Investments and/or C-Rental to terminate, reduce or otherwise adversely change, or affect that customer's business

relationship with CSW, Investments and/or C-Rental.[12]

¶85.  Under the heading "Breach of the Non-Competition Agreement," the trial court found:

[Investments] has showed by a preponderance of the credible evidence that a valid and binding contract (the Non-Competition Agreement signed by Defendant Cascio and dated December 15, 2015) existed. This Non-Competition Agreement was part of a comprehensive settlement involving many documents. The settlement agreement, including the Non-Competition Agreement was an "arm's length" agreement, negotiated by the parties with advice of able counsel. [Cascio]'s testimony that the Non-Competition Agreement was not agreed to or signed by some mistake is not believable. Not only did [Investments] show [Cascio] to have lied under oath on a previous matter on a material issue of the litigation (money in the safe), [Cascio]'s testimony was contradictory. For example, he stated that he "never" used the term "customer" while using the term "customer" on the stand multiple times. And, stating and trying to show what a good businessman he had been in building the businesses involved yet then stating he simply did not read the document which contained the main sticking point of the settlement negotiations.

[Investments] proved by a preponderance of the credible evidence that . . . Cascio broke and/or breached this Non[-]Competition Agreement. These breaches were not inadvertent or by accident.

Under the totality of the circumstances and in light of [Cascio]'s aggregate conduct, the credible proof evidenced a course of malicious conduct, deliberate conduct, and/or at the very least, conduct done with a reckless or gross disregard of the rights of [Investments]. At least eighty-five times [Cascio] tried to induce [Investments'] customers, existing tenants to long term leases, to move into buildings or onto property owed by . . . Cascio.

Under the heading "Damages," the court held:

[Investments] has proven by a preponderance of the credible evidence certain damages . . . .

c. Cascio Storage and Warehouse, Inc.: due to [Cascio]'s threatening letter

_____

12  The words "terminate" and "reduce" may also be eliminated from consideration. There was no evidence that Cascio or CSW caused the termination or reduction of any customer's business relationship with Investments.

38

regarding the sprinkler system [Investments] paid the amount of $53,665.28; $53,665.28 is awarded as reasonable compensation for injuries actually sustained by the Plaintiff;

¶86. The court found that Cascio violated the NCA. But without any explanation or identification of what provision of the NCA Cascio violated, the court awarded $53,665.28 to Investments "due to [Cascio's] threatening letter regarding the sprinkler system."

¶87. Despite this, the majority explains its findings in paragraph 33 of its opinion. The language used by the majority is simply not in the NCA or in the court's orders, findings, or judgments.

### A. Cascio was not prohibited from contacting CSW.

¶88. The first part of the majority's finding, in paragraph 33, is that the NCA did not prohibit Cascio from contacting CSW. This is correct. The NCA did not prohibit Cascio from sending a letter to CSW, a corporation of which Cascio is a shareholder and a member of the board of directors.

¶89. This is an important finding because it helps us to interpret the crucial language in the NCA. The NCA could have been drafted to simply prohibit Cascio from any contact with CSW. But it did not. In fact, the evidence supports the conclusion that Cascio's sisters expected and wanted Cascio's input. As a shareholder and board member of CSW, Cascio owed a duty to CSW and the other shareholders to report any issues of potential liability or concern for its business operations.

¶90. In the chancery settlement agreement, the parties formally agreed that Cascio would retain his ownership and board membership in CSW. A CSW corporate resolution, signed

by Cascio's sisters, acknowledged "*that the success of the Corporation requires the active interest, support and personal attention of the Shareholders . . . .*" (Emphasis added.) The Agreed Final Judgment, signed by the chancery judge, adjudicated that "the control of CSW [wa]s returned to its Shareholders (Phil Cascio, Jr., Jackie Cascio Pearson and Phyllis Cascio) and its Directors (Phil Cascio, Jr., Jackie Cascio Pearson and Phyllis Cascio)."

¶91. Jackie testified that the NCA did not prohibit Cascio's communication with Terry Hughes, the president and chief operating officer of CSW:

> Q:    Okay. So just to be clear, your position is that [Cascio] can talk to Terry Hughes and anybody connected with Cascio Storage and Warehouse. He just can't talk to them about Investments?
>
> A:    How can I tell him not to talk to Terry Hughes? Terry Hughes is the operation manager so, I mean, he can talk to Terry Hughes.

¶92. Jackie also conceded that Cascio's ownership interest in CSW gave him the right to contact CSW with concerns over a potential fire hazard. Jackie testified:

> Q:    As the owner, you agree [Cascio] has the right to report risks that he observes?
>
> A:    Yes.
>
> . . . .
>
> Q:    You're not saying that Phil Cascio shouldn't have reported risks that he observes with the operations of CSW, or for that matter, Cascio Investments, to the president of CSW, are you?
>
> A:    No.

¶93. Despite the majority's agreement that Cascio had the right to send a letter to CSW, the majority, in footnote 6, seems to argue that Cascio contracted away some right, but it does

not explain what exactly he contracted away. The majority also cites *Fought v. Morris*, 543 So. 2d 167, 171 (Miss. 1989), for the proposition that "a shareholder is not prohibited from contracting away rights of control as Cascio did here by executing the NCA." Maj. Op. ¶ 33 n.6. *Fought* is an important case in Mississippi business and corporate law. It stands for the proposition that the action(s) of majority shareholders must be "intrinsically fair" to the minority shareholder.[13] *Fought*, 543 So. 2d at 171 (internal quotation marks omitted). This Court's holding in *Fought* simply does not support the majority's conclusion. There is no evidence that Cascio contracted away any of his rights as a shareholder and board member of CSW. In fact, the majority owners of CSW and the sole owners of Investments expected Cascio's input in the business affairs of CSW.

    *B.  The majority's characterization of the breach.*

¶94. Next, the majority explains Cascio's breach as follows:

> Cascio violated the more specific prohibition of encouraging (through threats) CSW, a customer of Investments, to solicit changes that adversely impacted

---

[13] The language quoted by the majority is without proper context. The Court discussed the majority shareholders' obligation owed to the minority shareholder:

> [I]n a close corporation where a majority stockholder stands to benefit as a controlling stockholder, the majority's action must be "intrinsically fair" to the minority interest. Thus, stockholders in close corporations must bear toward each other the same relationship of trust and confidence which prevails in partnerships, rather than resort to statutory defenses. This holding does not mean that directors, executive officers and stockholders are not required to adhere to the corporate statutes; rather, we mean that blind adherence to corporate statutes may not be used to circumvent the corporation's by-laws, charter or various agreements, such as a stock redemption agreement, because of the "intrinsically fair" standard we here adopt today.

*Fought*, 543 So. 2d at 171.

41

Investments financially. Therefore, according to the text of the NCA, we conclude that Cascio was not prohibited from contacting "his own company," as Cascio claims, but rather, he violated the NCA by effectuating a financially detrimental act by Investments through threats and intimidation.

Maj. Op. ¶ 33 (citations omitted).

### 1. Investments acted on Terry Hughes's recommendation.

¶95. Cascio's letter was addressed to "Mr. Terry Hughes, President & Chief Operations Officer, Cascio Storage & Warehouse, Inc." The letter concerned the operation of CSW and potential risks to CSW and its customers. Cascio warned CSW that Investments' buildings were not properly equipped.

¶96. The majority states that my opinion:

treats Cascio's letter as standard correspondence leading Terry Hughes to make an independent business decision despite no testimony from Hughes or anyone else to support this conclusion. While it would have been beneficial for the circuit court to have been more thorough in its findings of fact, its conclusion is clearly supported by the evidence. *Cascio's threats led to Hughes's recommendation that was then relied upon by Investments.*

Maj. Op. ¶ 33 (emphasis added) (citation omitted).

¶97. Absolutely no evidence in the record supports this last sentence. Terry Hughes did not testify. There was no evidence offered by Investments as to Hughes's reason(s) for his recommendation. The majority recognizes that the trial court did not make this finding. No evidence supports any conclusion that this was not Terry Hughes's "independent business decision" or that "Cascio's threats lead to Hughes's recommendation." Maj. Op. ¶ 33. The evidence supports only the conclusion that Investments relied on Hughes's recommendation.

¶98. There is no dispute that Investments decided to install the sprinkler system because

42

Terry Hughes recommended it.  Jackie testified:

> Q:      Jackie, did Cascio Investments try to install a sprinkler system?
>
> A:      Yes.
>
> Q:      Why did you do that?
>
> A:      Well, from Terry's recommendation, and like I say, Terry, he's the operating manager of Cascio Investment[14] because like I say, we have just a few buildings in Greenville, and Cascio Storage rents our buildings out. So due to his recommendation, we decided to put a sprinkler system in there.

Kenneth Pearson, Jackie's husband, testified:

> Q:      Did Cascio Investments consult with anyone concerning whether or not they should install those systems?
>
> A:      We just consulted everything with Terry Hughes, you know.
>
> Q:      And *did Terry Hughes agree with Mr. Cascio that those systems should be in place*?
>
> A:      *Yes.*
>
> Q:      And you rely on Mr. Hughes' opinion and advice?
>
> A:      Yes.
>
> . . . .
>
> Q.      Did . . . Cascio Investments try to comply with [Cascio's] letter?
>
> A.      Yes.
>
> Q.      And that was because Terry Hughes recommended?
>
> A.      That's correct.

---

[14]   Terry Hughes was the president and chief operating officer of CSW, not Investments.

(Emphasis added.)

¶99.  Investments acknowledged that it had the authority to reject Hughes's recommendation.  Instead, Investments chose to follow Hughes's recommendation:

> A:  [CSW] is owned by the three of us.
>
> Q:  In equal shares?
>
> A:  One-third each.
>
> Q:  One-third each.  And so you and your sister had collectively majority interest, right?
>
> A:  Yes.
>
> Q:  You could have instructed, if you wanted to, Mr. Hughes to say we are not going to invest this money, correct?
>
> A:  I could have but I wouldn't because Terry is running the company, and *I didn't want to make Terry upset with us.*

(Emphasis added.)

¶100.  CSW's president and chief operating officer agreed with Cascio that the facilities used by CSW needed a sprinkler system.  The Cascio sisters, who owned Investments outright and were majority owners of CSW, agreed with Hughes's recommendation.[15]  They conceded that they could have rejected his recommendation, but they did not.  The evidence clearly established that Investments made an independent business decision to install the sprinkler system.  This should be dispositive of the issue.

> 2.  *Did the installation of the sprinkler system adversely*

---

[15]  The majority acknowledges that "*Hughes recommended* to Cascio's sisters, Jackie and Phyllis, that Investments purchase and install the sprinkler system, which *they agreed to do*."  Maj. Op. ¶ 31 (emphasis added).

44

*impact Investments financially and was that a breach of the NCA?*

¶101. The majority concludes that "Cascio violated the more specific prohibition of encouraging (through threats) CSW, a customer of Investments,[16] to solicit changes that adversely impacted Investments financially." Maj. Op. ¶ 33. The relevant provision of the NCA requires:

> For a period of five (5) years . . . neither [Cascio] nor anyone acting in concert with [Cascio], whether directly or indirectly, . . . shall by any means encourage any existing customer of CSW, Investments and/or C-Rental to . . . otherwise adversely change, or affect that customer's business relationship with CSW, Investments and/or C-Rental.

¶102. There is absolutely no language in the NCA that prohibits Cascio or CSW from "solicit[ing] changes that adversely impact[] Investments financially." The NCA prohibits Cascio from "adversely chang[ing] or affect[ing] *that customer's business relationship* with CSW, Investments and/or C-Rental." (Emphasis added.)

¶103. If we assume, which I do not think we can, that CSW was intended to also be a "customer" of Investments under this language, there was no evidence that Cascio's letter breached the NCA. There was certainly no proof that the "business relationship" was adversely changed or affected.

¶104. The "business relationship" between CSW and Investments remained the same after the letter. The Cascio sisters and Investments made a business judgment to make a capital improvement to Investments' property. They installed the sprinkler systems. The sprinkler

---

[16] Paragraph 3 of the NCA uses the language "any existing customer of CSW, Investments and/or C-Rental." I see no way to interpret this to include CSW as an "existing customer" of Investments.

45

system was a capital improvement and an enhancement to the value of Investments' property. The installation of the sprinkler system expanded the permissible storage uses, and it provided a potential for increased income. There was simply no proof of loss of income or damage to the business relationship between CSW and Investments. No Mississippi case finds that the breach of a noncompetition agreement allowed an entity to recover the full cost of a capital improvement that enhanced the value of its business.

¶105. Cascio identified a potential business risk. On behalf of CSW, Hughes agreed and made a recommendation and request to Investments. The Cascio sisters, the mutual majority owners of both entities, made a *decision* based on Hughes's recommendation to purchase and install the sprinkler system. I find no evidence to support a breach of the NCA.

> 3. *Did the installation of the sprinkler system effectuate a financially detrimental act by Investment and was that a breach of the NCA?*

¶106. The majority concludes that Cascio "violated the NCA by effectuating a financially detrimental act by Investments through threats and intimidation."[17]  Maj. Op. ¶ 33. Again, the relevant provision of the NCA requires:

> For a period of five (5) years . . . neither [Cascio] nor anyone acting in concert with [Cascio], whether directly or indirectly, . . .shall by any means encourage any existing customer of CSW, Investments and/or C-Rental to . . . otherwise adversely change, or affect that customer's business relationship with CSW, Investments and/or C-Rental.

¶107. Absolutely no language in the NCA prohibits Cascio or CSW from "effectuating a

---

[17] Paragraph 3 of the NCA uses the language "any existing customer of CSW, Investments and/or C-Rental."  I see no way to interpret this to include CSW as an "existing customer" of Investments.

financially detrimental act by Investments."

¶108. As discussed above, the Cascio sisters, as mutual owners of both CSW and Investments, could have rejected Cascio's letter and Hughes's recommendation on the sprinkler systems. They did not. The evidence simply does not support a conclusion that Cascio's letter and CSW's recommendation "adversely chang[ed], or affect[ed] the business relationship between CSW and Investments." If one concludes that CSW was Investments' "customer," one must also recognize that there was no evidence that their "business relationship" changed.

¶109. Finally, does the finding of "through threats and intimidation" have any impact on the outcome of this case? The majority seems to believe that this is an important finding. Yet the NCA does not say anything about "threats and intimidation." The record is filled with acrimonious dealings between these parties. They have been involved in litigation for quite some time. The trial court did not find any violation of law or breach of the NCA through threats or intimidation. Although Cascio's letter was strongly worded and included threatening language, Justice Chamberlin's humorous use of a quotation he attributes to Mark Twain in footnote 1 clearly indicates that these are not the best of times for these family members and business partners.

¶110. The NCA does not include a "be nice" provision. For all the majority knows and for all the evidence indicates, it would be a good business practice for a storage facility to have a sprinkler system to avoid loss by fire. I cannot find that the evidence supports a finding of a breach of the NCA simply because of a strongly worded letter from a business partner who

is concerned about a significant liability issue that could affect the financial viability of the company. There was no breach of the NCA by the letter's characterization as "threatening or intimidating."

¶111. In conclusion, I cannot find that there is evidence to support the finding that Cascio's letter to CSW adversely changed or affected CSW's business relationship with Investments. By asking, demanding, or even threatening Investments to add a sprinkler system, it may not be said that Cascio "adversely change[d], or affect[ed CSW's] business relationship with . . . Investments." CSW continued to be a tenant. There was no evidence of any loss of income from CSW's use of Investments' facilities. Also, Investments' facility would be improved by having a sprinkler system, a capital asset. If CSW had moved its customers away from Investments' facilities, then there would have been an adverse change or affect on the business relationship. There is simply no evidence that Cascio's letter to CSW and Investments' purchase of a sprinkler system "adversely change[d] or affect[ed CSW's] business relationship with . . . Investments."

¶112. I respectfully dissent and would render judgment as to this issue.

V.	*Whether substantial evidence supports an award of actual damages.*

¶113. Assuming the majority is correct that Cascio's letter was a breach, I also disagree with the finding that Investments suffered any loss or damage. The court ruled that "due to [Cascio's] threatening letter regarding the sprinkler system [Investments] paid the amount of $53,665.28; $53,665.28 is awarded as reasonable compensation for injuries actually sustained by [Investments]."

¶114. "[T]he court's purpose in establishing a measure of damages for breach of contract is to put the injured party in the position where [it] would have been but for the breach." *Frierson v. Delta Outdoor, Inc.*, 794 So. 2d 220, 225 (Miss. 2001) (quoting *Theobald v. Nosser*, 752 So. 2d 1036, 1042 (Miss. 1999)). "However, it is never contemplated that the injured party be placed in a better position than [it] otherwise would have been in if the contract had been performed." *Polk v. Sexton*, 613 So. 2d 841, 844 (Miss. 1993). "A party is not entitled to a recovery of damages if it would constitute a windfall or 'double recovery.'" *Garris v. Smith's G & G, LLC*, 941 So. 2d 228, 232 (Miss. Ct. App. 2006) (quoting *Ciba-Geigy Corp. v. Murphree*, 653 So. 2d 857, 873 (Miss. 1994)).

¶115. "Damages for breach of contract must be proven 'with reasonable certainty and not based merely on speculation and conjecture.'" *Lovett v. E.L. Garner, Inc.*, 511 So. 2d 1346, 1352 (Miss. 1987) (quoting *Burnham v. Joseph*, 482 So. 2d 1151, 1153 (Miss. 1986)). "In order to prove a prima facie case of damages, 'the plaintiff must show (1) a loss, and (2) that the defendant's conduct caused the loss.'" *Progressive Cas. Ins. Co. v. All Care, Inc.*, 914 So. 2d 214, 221 (Miss. Ct. App. 2005) (quoting *MBF Corp. v. Century Bus. Commc'ns, Inc.*, 663 So. 2d 595, 598 (Miss. 1995)). "Causation must be as specific and certain as the nature of the particular case may permit." *Id.* at 223 (citing *Freeman v. Huseman Oil Int'l, Inc.*, 717 So. 2d 742, 746 (Miss. 1998)).

¶116. The award of $53,665.28 in damages for the sprinkler system does not represent compensation for a "loss." *Id.* at 221 (internal quotation mark omitted) (quoting *MBF Corp.*, 663 So. 2d at 598). Indeed, Investments conceded that it suffered no loss by its purchase of

49

the sprinkler system.  Jackie testified:

> Q.  Well, obviously, Investments now has the benefit of the equipment that it has installed, right?
>
> A:  Yes . . . .
>
> Q.  And you agree that the system has value, right?
>
> A:  I mean, it's a sprinkler building now. We put more money into it. . . .
>
> Q:  And because of the sprinkler system, [CSW] is now able to use the Investments buildings to store other products that it could not store before, true?
>
> A:  That's true.

¶117.  Kenneth Pearson further testified:

> Q:  But you do understand that Investments has the benefit of that installation right now?
>
> A:  That's correct.
>
> Q:  And that it's not a loss to the company, it's added value to the building, correct?
>
> A:  Correct.
>
> . . . .
>
> Q:  You'd expect that the value of the property would be increased based on the installation of that equipment?
>
> A:  Should be.

¶118.  The purchase and installation of the sprinkler system was an admitted *improvement* that Investments *voluntarily installed and will continue to use*.  The award of compensation for the full cost of the sprinkler system "placed [Investments] in a better position than [it]

otherwise would have been in if the contract had been performed." *Polk*, 613 So. 2d at 844. Investments would receive both the sprinkler system and the full amount paid for the sprinkler system. Investments would receive an improvement to its property at no cost. Rather than leave Investments in the position it would have been in if there had been no alleged breach, the court awarded a bonus recovery of a free sprinkler system.

¶119. Pearson and Phyllis simultaneously held the majority shareholder and membership interests in both CSW and Investments. Pearson admitted that Investments was free to reject Hughes's recommendation that Investments install the sprinkler system. Further, she admitted that the decision to install the sprinkler system was based on Hughes's recommendation. Any suggestion that Pearson, Phyllis, or Investments were motivated by a concern that the state fire marshal might be alerted to violations or that a law firm may become involved does not make the choice any less voluntary. To the contrary, the fact that Investments made the expenditure strongly demonstrates the existence of hazards that required attention.

¶120. I respectfully dissent and would render judgment as to this issue.

VI.     *The award of nominal damages does not constitute a double recovery.*

¶121. I concur as to this issue.

VII.     *The award of injunctive relief is valid.*

¶122. I concur as to this issue, subject to my findings in issue I.

VIII.     *Whether an award of punitive damages was warranted.*

¶123. The court found that "a punitive damage award (*using the compensatory damages of*

*$4,800.00 and $53,665.28 for a total of $58,465.28*) [wa]s awarded in the amount of $880,000." (Emphasis added.) The court determined that "[t]his amount [wa]s reasonable and not constitutionally excessive." Because of the statutory cap, the court reduced the punitive damages award to $650,000. Miss. Code Ann. §11-1-65(3)(a)(vi) (Rev. 2019).[18]

¶124. As previously discussed, I disagree with the finding that there was a breach of the NCA and with the $53,665.28 award in damages for the sprinkler system. Without that award, we are left with a total of $4,800 in actual damages.[19] I do not find such an amount justifies $880,000 in punitive damages. I disagree with the court and find that such an award is unreasonable and excessive.

¶125. Even if the total amount of actual damages ($58,465.28) are upheld, they cannot justify the amount of punitive damages awarded. Indeed, assuming all actual damages are upheld, the resulting punitive-damages ratio is approximately 15:1. Removing the damages awarded for the sprinkler system, leaving only $4,800 in damages, results in a punitive-damages ratio of approximately 183:1.[20]

¶126. The United States Supreme Court declined "to impose a bright-line ratio which a punitive damages award cannot exceed" but stated that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425, 123

---

[18] The trial court found Cascio's net worth to be $32.5 million.

[19] The $4,800 award was for Cascio's contacts with U.S. Ag.

[20] Applying the $650,000 statutory cap, the punitive-damages ratio would be approximately 11:1 for $58,465.28 in damages and 135:1 for $4,800 in damages.

S. Ct. 1513, 155 L. Ed. 2d 585 (2003); *see also* **Pac. Mut. Life Ins. Co. v. Haslip**, 499 U.S. 1, 23-24, 111 S. Ct. 1032, 113 L. Ed. 2d 1 (1991) (holding that a punitive-damages award that was more than four times the amount of compensatory damages did not violate due process but was "close to the line" of "constitutional impropriety"). Since **Campbell**, this Court has vacated or remitted punitive-damages awards exceeding a single-digit ratio. *See* **Miss. Power & Light Co. v. Cook**, 832 So. 2d 474, 478, 485 (Miss. 2002) (holding that $5 million awarded in punitive damages was excessive in light of actual damages of $150,000 and a that remittitur of $4.5 million should be entered); **United Am. Ins. Co. v. Merrill**, 978 So. 2d 613, 636 (Miss. 2007) (affirming punitive-damages award that was "less than five times the amount of compensatory damages" because it was consistent with the holding in **Campbell**).

¶127. "[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." **Campbell**, 538 U.S. at 426. Here, the court's punitive-damages award is neither reasonable nor proportionate "to the amount of harm to [Investments] and to the general damages recovered." **Id.** Accordingly, I would reverse and render the punitive-damages award.

      IX.    *Whether an award of attorneys' fees is warranted.*

¶128. The trial court awarded $232,455.43 in attorneys' fees. At trial, Investments presented invoices totaling $133,292.76. With no analysis, the trial court awarded the total amount presented, and ruled: "Plaintiff is awarded the amount of $133,292.76 for attorney fees, plus litigation fees and expenses through trial." Investments sought to "supplement the

53

record" with new attorneys' fee invoices. The trial court allowed that submission over objection and, after the punitive-damages hearing, added $99,162.67 for invoices presented during the punitive-damages phase, bringing the total of the attorneys' fee award to $232,455.43.

¶129. Thus, Cascio has been ordered to pay $321,045.49 in attorneys' fees and expenses without an explanation, analysis, or justification based on the factors in *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982), or Rule 1.5(a) of the Mississippi Rules of Professional Conduct. This Court approves the award of $321,045.49 without giving Cascio the benefit of a hearing or opportunity to challenge, cross-examine or offer evidence to rebut the invoices submitted.

¶130. Cascio argues that the attorneys' fee award was invalid because it was not supported by any factors articulated in *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982), and because Investments never presented any evidence supporting a finding of reasonableness. Cascio claims that the circuit court judge erroneously suggested that Plaintiffs' mere presentation of invoices shifted an evidentiary burden to Cascio:

> During the first hearing, the Defendant objected to the timing of the submission of the attorney fees but not to the amount of attorney fees. At the punitive stage of the hearing, Defendant did object to the additional submissions of attorney fees based on the lack of expert testimony. The submissions were allowed. Defendant did not put on evidence to show the unreasonableness of the attorney fee request.

¶131. The reasonableness of attorneys' fees is governed by Rule 1.5(a) of the Mississippi Rules of Professional Conduct:

> A lawyer's fee shall be reasonable. The factors to be considered in determining

the reasonableness of a fee include the following: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.

This Court identified these factors in *McKee*, 418 So. 2d at 767.

¶132. Then, in ***BellSouth Personal Communications, LLC v. Board of Supervisors of Hinds County***, this Court explained how a trial court should analyze the award of attorneys' fees:

> *This Court has stated the importance of issuing a complete rule 1.5(a) analysis and gave reference to what it expects by way of credible evidence.* "The *McKee* factors should have been applied by the trial judge in determining the amount of attorneys' fees to be awarded, *and any award should be supported with factual determinations.*"

***BellSouth Pers. Commc'ns, LLC v. Bd. of Supervisors of Hinds Cnty.***, 912 So. 2d 436, 446-47 (Miss. 2005) (emphasis added) (citations omitted).

¶133. This Court further explained how trial courts are to make this determination:

> [I]n the case at bar, the trial judge "should have applied these factors in determining the amount of attorney's fees to be awarded and supported that award with factual determinations." *To hold otherwise, would be to obligate this Court to make an original reasonableness determination and, in so doing, deprive us of our proper judicial function as a reviewing appellate body.*
>
> *When a trial court makes such attorney's fees awards, it should do so with caution and clarity.* While Miss. R. Civ. P. 41(a)(2) expressly confers upon the trial courts the discretion to assess attorney's fees, *this discretion should be appropriately exercised with findings of fact and conclusions of law to undergird both the award and the amount of the attorney's fees and related*

*expenses.*

> We have accordingly expressly enumerated the standard by which such a reasonableness determination be made and have mandated that a trial court consider the eight factors enumerated in Rule 1.5 of the Rules of Professional Conduct. While the trial judge has the discretionary prerogative to make such a determination, and this Court affords substantial deference to such discretion, *a judge's discretion is not unfettered*. Moreover, trial court judges *must follow the appropriate procedure and make the requisite findings of fact necessary to insure a losing litigant is only made to compensate his adversary for fees and expenses which were reasonably incurred*. Based on the record before us, we are thus constrained, as a matter of law, to find that the trial court in today's case abused his discretion in failing to undergird his attorney's fees award with specific findings consistent with MRPC 1.5 and *McKee*.

*Id.* at 447-48 (emphasis added) (citation omitted).

¶134. Basic due process demands that Cascio be given an opportunity for discovery, cross-examination, and the opportunity to present adverse testimony as to the award of attorney's fees. Cascio's counsel should be given an opportunity to challenge the necessity of the charges of four separate lawyers (two charging $470 and $445 an hour) to perform work on the appeal. Cascio contends that the rates charged are excessive, as is the involvement of four attorneys, and Cascio has been denied any opportunity to challenge the invoices. Cascio claims he should be able to examine witnesses to determine: whether Investments paid these invoices; whether the attorneys' hourly rates or the attorney assignments were approved by Investments; whether Investments approved substantial increases in the hourly rates during the two years that this action was being litigated;[21] and whether Investments objected to any of the invoices. Further, Cascio should be allowed to

---

[21] During the pendency of this appeal, Timothy J. Anzenberger's hourly rate was increased from $300 to $350.

56

discover the engagement letter and have knowledge of the agreement between Investments and its attorneys for the payment of fees and expenses. I agree.

¶135. In issue III, the majority recognized it was improper for the trial court to add the Cascio sisters as parties based on the discovery that Investments had not incurred attorneys' fees or expenses. Maj. Op. ¶ 28. The evidence revealed that Investments' attorneys' fees were billed to Jackie individually. There was no evidence to support a finding that Investments suffered a loss or incurred any expense for attorneys' fees.[22] The record before the trial court and now this Court has established that Investments has never been invoiced, and has never paid, any attorneys' fees. Since Jackie has no contractual right to an award of attorneys' fees and since Investments has incurred no obligation for attorneys' fees, no award should be made to Investments.

¶136. Finally, I am concerned with the amount of attorneys' fee awarded when compared to the result. Jackie recognized that her counsel invoiced her more than $300,000 for a two-day trial that established an actual rental loss of $4,800.[23] The primary attorneys charged from $300 to $470 per hour for the litigation of a basic commercial contract claim. Without

---

[22] All of the attorneys' invoices were addressed to Jackie, individually. The trial court recognized that Jackie had no standing to seek relief under the NCA. The trial court added Jackie as a party sua sponte, without notice to any party, in an effort apparently to justify the award of attorneys' fees and punitive damages to her. The majority recognizes this error, yet it affirms the award of attorneys' fees to a non-party.

[23] Jackie is not, and has never been, entitled to a contractual attorneys' fee award. The contractual provision upon which fees are sought provides that "[i]n the event of a breach of any provisions of this NCA, in addition to any provable damages, CSW, Investments and/or C-Rental shall be entitled to injunctive relief and reasonable attorney's fees and litigation expenses."

an analysis of the factors in Rule 1.5 or *McKee*, I do not have sufficient information to determine whether these fees and expenses were reasonable, necessary, or proper.

¶137. I cannot agree to the award of $321,045.49 in attorneys' fees and expenses without providing Cascio with an opportunity to challenge the award. Further, I cannot agree to the award of $321,045.49 in attorneys' fees and expenses without at least one judicial officer providing an explanation and analysis of the factors in *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982), or Rule 1.5(a) of the Mississippi Rules of Professional Conduct. Because I find the trial court and this Court have failed to make this award based on an analysis of Rule 1.5(a) of the Mississippi Rules of Professional Conduct or the *McKee* factors and have not provided a record of this analysis with clarity and consistency, I respectfully dissent as to the award of attorneys' fees and expenses.

## CROSS-APPEAL

    I.     *Investments' constitutional challenge to the punitive-damages cap is procedurally barred.*

    II.     *Whether the punitive-damages cap is unconstitutional.*

    III.     *The circuit court did not err by failing to grant additional injunctive relief.*

¶138. I concur with the majority as to these issues.

**COLEMAN, J., JOINS THIS OPINION. RANDOLPH, C.J., JOINS THIS OPINION IN PART.**

58